UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| EDWARD STEVENS,<br><br>                    Petitioner,<br><br>      v.<br><br>TEREMA CARLIN,<br><br>                    Respondent. | Case No. 3:14-cv-00403-REB<br><br>**MEMORANDUM DECISION AND ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS** |

Pending before the Court is a Petition for Writ of Habeas Corpus filed by Idaho state prisoner Edward Stevens ("Petitioner" or "Stevens"). Petitioner challenges his Ada County conviction for first-degree murder. (Dkt. 1.) The Petition is fully briefed. (Dkt. 15, 23, 28.) The Court takes judicial notice of the records from Petitioner's state court proceedings, which have been lodged by the State. (Dkt. 10.) *See* Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 n.1 (9th Cir. 2006).

All named parties have consented to the jurisdiction of a U.S. Magistrate Judge to conduct all proceedings in this case, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (Dkt. 9.) Having carefully reviewed the record in this matter, including the state court record, the Court concludes that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d). Accordingly, the Court enters the following Order granting Claim 1 of the Petition and requiring the State to release or to begin new trial proceedings against Petitioner within 120 days.

**MEMORANDUM DECISION AND ORDER - 1**

# SUMMARY OF DECISION

Edward Stevens, the Petitioner in this case, was convicted in Idaho state court of the first-degree murder of an eleven-month-old child. Prosecutors based their case against him on the theory that Stevens violently shook the child and hit the child's head against a bathtub, causing a fatal skull fracture. Stevens has always maintained that the child's injuries resulted from an accidental fall down the stairs. The first-degree murder charge was based on the prosecution's theory that Stevens violently shook the child; without such shaking, the prosecution could not have obtained a conviction for first-degree murder.

At trial, the strongest evidence against Stevens was expert testimony that a certain type of tissue damage found in the child's eyes after death was highly specific to shaken-baby syndrome. However, after Stevens had been convicted, two types of relevant evidence surfaced. First, it was discovered that the child's eyes might have been removed from the body for examination not at the autopsy, but after the body was released from State custody and embalmed. This fact would have established a break in the evidence chain of custody of the eyes. Second, Stevens obtained evidence that the tissue damage in the child's eyes might have been caused by the embalming process, instead of by shaking. These pieces of evidence, if true, would have called into question the prosecution's expert witness testimony, which was that the condition of the child's eyes was specific evidence showing that the child had been violently shaken.

Upon finding the new evidence, Stevens's attorneys investigated whether Stevens could assert a claim under the decision in the case of *Brady v. Maryland*, 373 U.S. 83 (1963). In *Brady*, the United States Supreme Court ruled that due process of law requires a prosecutor to discover and disclose to the accused all of the evidence known to the prosecutor's investigative team that is favorable to the accused regarding guilt or punishment. In this case, the State did not disclose to Stevens available evidence suggesting that its expert had examined and based his testimony on eyes *that had been embalmed*. In response, prosecutors argued both that they did not know of the evidence before trial and that that they did not know the potential significance of the evidence.[1]

Stevens filed a motion for a new trial in the state district court, based on this new evidence. When that was unsuccessful, he pursued a state court appeal. He then filed a state petition for post-conviction relief, in which he argued that prosecutors had failed to disclose evidence required by *Brady* and that Stevens had received ineffective assistance of counsel in the trial and appellate proceedings. The last step of Steven's state court proceedings was an appeal to the Idaho Court of Appeals. In that appeal, the Idaho Court of Appeals considered Stevens's *Brady* claim. In doing so, the court assumed that the child's eyes were removed after embalming; however, the court rejected the claim nonetheless. The Idaho Supreme Court declined to review the decision.

---

[1] There is no evidence showing that the prosecutors in this case acted in bad faith in failing to disclose the information subject to *Brady*, and this decision should not be read to suggest a finding of bad faith.

When a person has sought and been denied relief from the state's highest court on alleged federal constitutional violations, as Stevens has, he may raise those challenges in federal court in a Petition for Writ of Habeas Corpus. A writ of habeas corpus is an order directing the custodian of a prisoner to produce the prisoner at a time and place stated in the order to prove that the prisoner is lawfully in custody. It is sometimes known as the "Great Writ," and has existed in various forms since the earliest days of English common law. The writ was a part of early American colonial jurisprudence and later incorporated in the United States Constitution, which provides that "the privilege of the writ of habeas corpus shall not be suspended, unless when in cases of rebellion or invasion the public safety may require it." U.S. Const. Art. I, § 9, cl. 2.

In modern times, federal statutes and United States Supreme Court rulings govern how and when a federal court can issue a writ of habeas corpus. The authority of a federal court to issue a writ of habeas corpus regarding a state criminal conviction has been narrowly limited, so as to give deference to state court decisions. However, issuance of a writ of habeas corpus remains a proper exercise of a federal court's jurisdiction when the law, facts, and circumstances call for its application.

As described in this decision, this Court concludes that the finding made by the initial post-conviction state district court that the child's eyes were removed at the autopsy, before release and embalming, was unreasonable in light of the evidence presented to that court. *See* 28 U.S.C. § 2244(d)(2). The Court further concludes that, even though the Idaho Court of Appeals assumed for the purposes of its decision that the

eyes were removed after embalming, that court unreasonably ruled that the prosecution did not violate *Brady* by failing to discover and disclose the evidence of post-embalming removal. *See* 28 U.S.C. § 2254(d)(1). In particular, the Court rules that the evidence of post-embalming removal of the child's eyes could have been used to impeach the expert testimony regarding the cause of the injuries to the child's eyes. This important impeachment evidence would have lent support to Stevens's contention that the child died from an accidental fall rather than from shaking and abuse. This evidence may have been enough to raise a reasonable doubt in the mind of a juror as to Stevens's guilt.

Because the Court finds that the state post-conviction court's factual finding was unreasonable, the Court is not bound by statutory standards that would otherwise require the Court to defer to the state court, as set forth in the habeas statute. *See* 28 U.S.C. §§ 2254(d), (e)(1). Instead, applicable law allows this Court to review Stevens's *Brady* claim "de novo," meaning anew.

For the reasons that follow, on de novo review, the Court rules that Stevens is entitled to relief on his *Brady* claim. Therefore, the Court issues a conditional writ of habeas corpus. Issuance of a conditional writ of habeas corpus does not require the responding prison warden to immediately release Stevens from custody. This Order allows the State 120 days to decide whether to release Stevens or retry him.

Because the Court has ruled that Stevens is entitled to relief and to issuance of a conditional writ of habeas corpus based upon his *Brady* claim, it is not necessary for the Court to rule upon the other claims made in his Petition.

# Table of Contents

Background..................................................................................................8

Habeas Corpus Standard of Law...................................................................19

Discussion.................................................................................................26

1.    Clearly-Established Law ....................................................................... 26

2.    In Denying Claim 1, the Idaho Court of Appeals Unreasonably Applied *Brady v. Maryland*, *Kyles v. Whitley*, and *Bagley v. United States* ...................................... 28

    A.    Assuming Post-Release and Post-Embalming Removal of the Eyes, the State Court's Conclusion that the Evidence Was Not in the Government's Possession or Control Was Unreasonable .................................................... 29

    B.    Assuming Post-Release and Post-Embalming Removal of the Eyes, the State Court's Implied Conclusion that the Evidence Was Not Impeaching Was Unreasonable ..................................................................... 32

3.    On De Novo Review, Petitioner Is Entitled to Habeas Relief on His *Brady* Claim ................................................................................ 36

    A.    The Court Need Not Defer to the Idaho Post-Conviction Court's Factual Finding that C.W.'s Eyes Were Removed Before Release and Embalming .......................................................................... 38

        i.    The evidence presented in state court ............................................. 38

        ii.   The state post-conviction court's finding of pre-release and pre-embalming removal.......................................................... 54

        iii.  The factual finding that C.W.'s eyes were removed at the autopsy was unreasonable in light of the evidence presented to the state court, and thus this Court need not apply the presumption of correctness ......................................................................... 61

B.    The Prosecution Failed to Disclose Material Impeachment Evidence to the Defense ........................................................................................... 68

Conclusion.........................................................................................................71

# BACKGROUND

Following a jury trial in the Fourth Judicial District Court in Ada County, Idaho, Petitioner was convicted of the first-degree murder of C.W., the eleven-month-old son of Petitioner's girlfriend.[2] The following facts are taken from Petitioner's state court proceedings:

> On the afternoon of December 27, 1996, [C.W.] sustained a serious head injury while in the care of Stevens, the child's mother's boyfriend. The child died the next day after he was declared brain dead and removed from life support. Stevens claimed the head injury was the result of an accidental fall down the stairs, but the State contended the head injury occurred after Stevens violently shook the child and slammed the child's head onto the edge of a bathtub. Stevens was charged with murder in the first degree for killing the child during the course of committing an aggravated battery, Idaho Code §§ 18-4001, 18-4002, 18-4003(d).

*Stevens v. State*, 327 P.3d 372, 378 (Idaho Ct. App. 2013) (*Stevens II*).

C.W. died from a head injury, but the State and Petitioner had vastly different versions of how C.W. sustained that injury. "Stevens argued the cause of the injury was accidental, asserting [Stevens] fell asleep and awoke approximately twenty minutes later to the sound of 'thumps or a thud' and discovered the child lying at the bottom of the stairs not moving. After attempting to rouse the child and administer cardiopulmonary resuscitation (CPR), Stevens called 911 approximately five minutes later." *Id*. at 379.

---

[2]    Petitioner was convicted after his second trial. The first trial ended in a mistrial when the jury could not reach a verdict.

The State's theory of the case was that "Stevens had been physically abusing the child since July, and on December 27, he was in the bathroom with the child, got frustrated with the child, violently shook the child, and then slammed the child's head against the side of the bathtub. The State further contended that Stevens then waited over half an hour to call 911." *Id.* The prosecution offered four types of evidence to support that theory: "(1) evidence that Stevens gave inconsistent accounts of what happened on December 27; (2) evidence that the child had been abused over the prior six months; (3) evidence that a child could not receive as severe a skull fracture as suffered by the child from a fall down stairs; and (4) evidence that the child had been shaken on December 27." *Id.*

As explained by the state district court during post-conviction proceedings, the first three types of evidence were highly controverted at trial. The first type of evidence, Petitioner's allegedly inconsistent statements, was of limited significance:

> First, the State claimed that Stevens gave different accounts of where he began CPR on [C.W.]. However, one of the individuals the State cited to specifically said he did not remember Stevens saying where CPR was started. At an interview on December 27, Stevens said that he began CPR in the kitchen, but gave [C.W.] a few breaths on the way from the bedroom to the kitchen. Second, the State claimed that Stevens gave inconsistent accounts of how many thumps he heard [when he awoke]. However, Stevens has maintained from the very beginning that he was not sure how many sounds he heard. Third, the State claimed that Stevens never told the police that [C.W.] had vomited in the bathtub the night before, and thus he had no explanation for why there was vomit in the bathtub. However, in an interview at St. Alphonsus on December 27, Stevens told Detectives that he

> was up with [C.W.] the night before because he was sick and
> "projectile vomiting."

(State's Lodging C-11 at 2360 (internal citations omitted).) Petitioner also informed the

police that C.W. had thrown up the morning of December 27. (State's Lodging A-9 at

1192-93.) Projectile vomiting was not unusual for C.W., who was undergoing a course of

medical treatment for this reflux problem; sometimes the treatment would help, and

sometimes it would not. (*Id.* at 682-85.)

The State also "claimed that Stevens never told the police he removed [C.W.'s]

shirt and shoes even though [C.W.'s] shirt and shoes were removed by the time the

paramedics got there." (State's Lodging C-11 at 2360.) However, Petitioner did state that

he had removed the shirt while he was attempting to revive C.W. in the master bedroom

and that "the only reason he did not disclose this fact earlier was that the police had never

asked about it." (*Id.*) Petitioner also stated that C.W. was wearing his shoes as Petitioner

attempted to revive him but did not explain why he was not wearing shoes when the

paramedics arrived. (*Id.*) It is unclear how Petitioner's failure to affirmatively state when

and where he removed the shoes is actually inconsistent with the fact that C.W. was not

wearing shoes when the paramedics saw him.

With its second type of evidence, the State attempted to show that Petitioner had

been abusing C.W. However, this testimony also was strongly disputed:

> First, the State presented the testimony of various individuals
> who stated they almost always saw [C.W.] with bruising on
> his body. These opinions indicated the bruising looked like it
> was caused by abuse. Stevens countered this with the
> testimony of various individuals who said [C.W.] had normal
> bruising for a child of his age, including the testimony of

[C.W.'s] pediatricians. Second, the State presented the testimony of several individuals who had heard Stevens call [C.W.] names such as Mr. shitty diapers, little asshole and little maggot. These individuals testified they did not think Stevens was joking when he used these names. Stevens contends that these names were used in jest, and [C.W.'s mother] admitted that she had also used the nickname Mr. shitty diapers to refer to [C.W.]. Third, the State presented instances of specific injuries [C.W.] sustained while on Stevens' watch. Mr. Stevens gave various explanations for how these injuries had occurred. Fourth, the State presented evidence that [C.W.] did not start getting bruises until he moved in with Stevens. Stevens' explanation for this was that [C.W.'s] bruising coincided with the point in [C.W.'s] life when he became mobile. Finally, the State argued Stevens failed to present any evidence that[] "anybody is responsible for bruises other than what occurred on the defendant's watch." However, at least six different witnesses testified they had seen [C.W.] fall and bruise himself. Stevens also showed that no one, including [C.W's mother], had ever seen him hit or spank [C.W.].

(*Id.* at 2360-61 (internal citations omitted).)

The third type of evidence presented by the State involved C.W.'s skull fracture.

The State's theory was that C.W. "could not have received his skull fracture from a fall down the stairs," but—again—there was conflicting expert testimony on this issue:

First, the State claimed that [C.W.'s] fracture was diastatic, which means that the edges of the fracture are wide apart. The State's expert Dr. Smith testified that "considerably more force" is required to produce a diastatic fracture. However, two of the State's other witnesses, including the Doctor who performed [C.W.'s] autopsy, testified the fracture did not appear to be diastatic. Second, the State called a physicist, Dr. Saami Shaibani, who testified it would have been physically impossible for [C.W.] to get this fracture in this precise location from a fall down the stairs. However, another witness for the State testified that [C.W.] would only have to hit his head "somewhere in that area" not necessarily at any particular point on the skull to create this fracture.

(*Id*. at 2361 (alteration omitted).) The State called five experts who testified that C.W. could not have gotten the skull fracture from falling down the stairs, partly based on the length of the skull fracture as measured at autopsy, which was between eight and nine centimeters.[3] Petitioner called three experts who testified the fracture was, in fact, consistent with C.W. falling down the stairs. (*Id*.)

As can been gleaned from this review of the first three types of evidence presented by the State at trial, what exactly happened to C.W. was the subject of much dispute, and there was evidence to support both the State's and Petitioner's versions of events. Therefore, as the state post-conviction court later acknowledged, the evidence that C.W. had shaken-baby syndrome "was the most important evidence in the State's case because it was direct evidence that [C.W.] was battered on December 27, which was a necessary element of the State's first degree murder charge." (*Id*.) Without the evidence of violent shaking, "it is unlikely the State would have been able to prove its first degree murder charge." (*Id*. at 2361-62.)

However, this evidence also was contested, and scientific evidence was presented that supported each version of what happened to C.W. For example, there was blood present between the two hemispheres of C.W.'s brain. One state expert testified that this

---

[3]    Although the State's assertion that C.W.'s skull fracture was eight to nine centimeters long "went unchallenged at trial" (State's Lodging C-11 at 2361), evidence later offered during Petitioner's post-conviction proceedings indicated that the fracture may actually have been much smaller at the time of injury. Dr. Patrick Barnes, one of Petitioner's post-conviction experts, stated that a CT scan taken after C.W. was injured and brought to St. Alphonsus Hospital, but before he was transferred to St. Luke's Hospital, indicated that (1) the fracture initially was only three to four centimeters long, and (2) the fracture later expanded to eight to nine centimeters as a result of intracranial pressure. (State's Lodging C-36, C-37.) Petitioner argues in Claim 2(c) that his trial counsel rendered ineffective assistance in failing to discover this evidence.

**MEMORANDUM DECISION AND ORDER - 12**

blood "could not be explained by a fall down the stairs," but a different state expert testified "that a severe fall down the stairs could possibly explain this type of injury." (*Id.* at 2362.)

The State also presented evidence that C.W. had "subarachnoid hemorrhaging and subdural hematomas." (*Id.*) Several of the State's expert witnesses testified that these injuries were consistent with shaken-baby syndrome. But two of the State's experts also testified that "intracranial pressure can cause subarachnoid hemorrhages and subdural hematomas," which was consistent with Petitioner's account of C.W.'s injuries. (*Id.*) C.W. also had retinal hemorrhaging. The evidence established that such hemorrhaging "can be a red flag for shaken baby syndrome," but several of the prosecution's own experts "admitted that intracranial pressure and subarachnoid hemorrhaging can also cause retinal hemorrhaging." (*Id.*)

The most crucial scientific evidence as to whether C.W. was shaken was offered by State's expert Dr. Brooks Crawford, an ophthalmologist who testified regarding his examination of C.W.'s eyes. Several months after C.W.'s death, his eyes were sent to Dr. Crawford for analysis. (State's Lodging C-27.) Dr. Crawford testified that C.W. "had hemorrhaging in over 30% of his eyes, hemorrhaging in both eyes, and no hemorrhaging in the equatorial region"—occurrences which Dr. Crawford explained are "rarely seen in cases involving only blunt trauma." (State's Lodging C-11 at 2362.)

Dr. Crawford testified that he could "think of *no other way to explain the findings*, this constellation of findings that we have here, *except for violent shaking. There's no*

*other explanation for it*." (State's Lodging A-9 at 789 (emphasis added).) However, as later noted by the post-conviction court, Dr. Crawford's own pathology report seems to contradict at least one of these findings. (State's Lodging C-11 at 2362 ("Dr. Crawford's Eye Pathology Report appears to indicate that [C.W.'s] right eye did have hemorrhaging in the equatorial region.").)

Perhaps the most definitive testimony from Dr. Crawford involved macular or perimacular folds, which occur in the eye when the internal limiting membrane tears away from the retina, allowing "the vitreous to contract a little bit and produce this fold that then goes around the macular area." (State's Lodging A-9 at 775.) Dr. Crawford saw such folds in C.W.'s eyes. Although macular folds are not found exclusively in shaken-baby cases, Dr. Crawford testified that they are "very highly specific" to shaken-baby syndrome because it would take a rotational force like whiplash, rather than a translational force like a "straight blow to the head," to cause macular folding. (*Id.* at 776-77.) Dr. Crawford stressed that the folds *almost always* signal shaken baby syndrome, noting that there were only "two cases now in the world's literature of macular folds that were not seen in shaken baby syndrome." (*Id.* at 842; *see also id.* at 858 ("We know of at least one other case now or two cases now where a macular fold did occur in a person who did have a severe head injury.").)

Dr. Gregory Kent, an ophthalmologist who took photographs of C.W.'s eyes with a retinal camera while C.W. was still alive, testified that he did not see any macular folding. (*Id.* at 748, 754.) However, Dr. Kent went on to testify that the fact that he did

not see the folds did not necessarily mean they did not exist, and that other techniques, such as a three-dimensional examination, might have been able to pick up injuries that were not visible from the retinal photographs. (*Id*. at 755.)

Petitioner countered Dr. Crawford's eye testimony with the testimony of Dr. Lawrence Thibault, a professor of bioengineering, neurosurgery, and orthopedic surgery specializing in head injuries. (*Id*. at 1556-59.) Dr. Thibault disagreed with Dr. Crawford that retinal hemorrhages could be caused by a rotational force or shearing force, an opinion that was based on Dr. Thibault's research on guinea pigs. (*Id*. at 1584-85.) He also testified that shaking could not cause macular folds in the eyes because "there's no force produced during shaking to give you that event." (*Id.* at 1586.) Petitioner also presented the testimony of forensic pathologist Dr. John Plunkett, who stated that short distant falls can cause retinal hemorrhaging and that with the injury that C.W. suffered, "there's a high probability that you are going to get retinal hemorrhage regardless of whether that injury was caused by a fall or someone picking him up and throwing him into a wall." (State's Lodging A-9 at 1961, 1973.) With respect to the macular folding seen by Dr. Crawford, Dr. Plunkett testified that macular folds can be found with different types of injuries and that "[n]o one knows" the significance of the presence of macular folds. (*Id*. at 1978-79.)

Petitioner was found guilty of first-degree murder. He was sentenced to life imprisonment without the possibility of parole.

While the case was on appeal, Petitioner filed a motion for a new trial, based on newly discovered evidence, under Idaho Criminal Rule 34. (State's Lodging A-3 at 56-57; *see also* State's Lodging A-5 at 435-39.) The judge in Petitioner's trial, who after the trial had been elected to a position as a justice of the Idaho Supreme Court, was then specially appointed to sit as a district trial judge to hear and decide Petitioner's motion for a new trial.

The newly discovered evidence "consist[ed] of, among other things, evidence that the child's eyes may have been damaged during embalming." *Stevens II*, 327 P.3d at 379. This evidence included (1) "a mortuary report indicating the child was embalmed prior to his eyes being removed for examination,"[4] *id*.; (2) a 2003 investigative report by Detective Jim Miller (a) stating that he and another detective (his brother, Detective Joe Miller) both remembered C.W.'s eyes being removed a day or two after the autopsy, (b) noting that on the day after the autopsy the coroner informed Detective Joe Miller that the eyes had been removed, and (c) concluding that the eyes were most likely removed on December 30 or 31, 1996, after the body had been released to the funeral home and embalmed on December 29; and (3) affidavits by forensic experts contending the damage to the eyes seen by Dr. Crawford occurred after death as a result of the embalming, rather than by shaking while the child was alive.

After an evidentiary hearing, the court denied the motion, concluding that although the evidence strongly suggested that the eyes were removed after C.W.'s body

---

[4]     This report will be referred to as the "mortuary report" or the "embalming report."

was released to the funeral home and embalmed, "the evidence indicating the eye damage occurred after death . . . was not newly discovered evidence because counsel could have discovered it with due diligence." *Stevens II*, 327 P.3d at 379. Thus, the evidence did not meet the standard for a new trial under Rule 34. The Idaho Supreme Court affirmed the conviction and the denial of Petitioner's motion for a new trial. *State v. Stevens*, 191 P.3d 217, 220 (Idaho 2008) (*Stevens I*).

Petitioner then filed a petition for state post-conviction relief, asserting that the State failed to disclose evidence that the victim's eyes were removed after embalming, as required by *Brady v. Maryland*, 373 U.S. 83 (1963), and that Petitioner's trial counsel rendered ineffective assistance in several areas, including by failing to discover the evidence of post-release and post-embalming removal of C.W.'s eyes. In April 2011, the court held an evidentiary hearing on Petitioner's *Brady* claim.[5] Following the hearing, the post-conviction court denied the petition. (State's Lodging C-11 at 2355-83; C-12.)

Petitioner appealed, and the Idaho Court of Appeals affirmed. The court held that Petitioner's *Brady* claim failed for the reasons that the undisclosed evidence of post-release and post-embalming removal was not exculpatory and was not in the possession or control of the government. *Stevens II*, 327 P.3d at 384-85. The court also rejected Petitioner's ineffective assistance of counsel claims, holding that Petitioner's counsel did not perform deficiently because, although counsel could have discovered the "date

---

[5] The evidentiary hearing also encompassed some of Petitioner's ineffective assistance claims, but the post-conviction court summarily dismissed the claim that Petitioner's direct appeal counsel was ineffective for failing to challenge the appointment of Justice Eismann to serve in the capacity of a state district judge to hear and decide Petitioner's motion for a new trial. (*Stevens II*, 327 P.3d at 380.)

**MEMORANDUM DECISION AND ORDER - 17**

discrepancy" before trial, "the mere fact counsel did not discover it did not amount to deficient performance where counsel's investigation was otherwise reasonable."[6] *Id*. at 391. The Idaho Supreme Court denied review. (State's Lodging D-12.)

Now, in his federal habeas corpus Petition, Petitioner raises these claims: (1) a due process claim under *Brady*, based on the prosecutor's failure to disclose evidence that the victim's eyes were removed after the body was released to the funeral home and embalmed; (2) a claim of ineffective assistance of trial counsel, based on counsel's failure (a) to discover the evidence regarding the timing of the removal of the victim's eyes, (b) to investigate reports that medication the C.W. was taking for his reflux problem could cause cardiac arrest, providing an additional reason why he might have fallen down the stairs, and (c) to consult with an expert regarding a scan of the victim's skull showing that the skull fracture was smaller than previously believed; and (3) a claim of ineffective assistance of direct appeal counsel, based on counsel's failure to challenge Justice Eismann's special appointment to hear Petitioner's motion for a new trial. (Dkt. 1.)

For the reasons that follow, the Court concludes that Petitioner is entitled to habeas relief on his *Brady* claim. Therefore, the Court need not address Petitioner's claims of ineffective assistance of counsel.

---

[6]    Dissenting, Judge Lansing believed that, taken together, the decisions in Petitioner's direct appeal and post-conviction appeal created "a flagrant 'Catch-22.'" *Stevens II*, 327 P.3d at 399 (Lansing, J., dissenting). On one hand, the courts had ruled "that Stevens was not entitled to a new trial because the embalming report was not newly discovered and, on the other hand, that he is not entitled to relief for ineffective assistance of counsel because a reasonably competent attorney would not have discovered the same evidence." *Id*. In other words, Judge Lansing reasoned that the Idaho courts' message to Petitioner was that he could not get a new trial because his attorneys should have discovered the evidence, but that he could not get post-conviction relief because his attorneys should *not* have been expected to discover the evidence.

**MEMORANDUM DECISION AND ORDER - 18**

# HABEAS CORPUS STANDARD OF LAW

It is "a fundamental precept of liberty" that a person is guaranteed freedom from unlawful restraint, and the writ of habeas corpus is "a vital instrument to secure that freedom." *Boumediene v. Bush*, 553 U.S. 723, 739 (2008). Habeas relief is available to obtain release from state custody only when a federal court determines that the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

Congress has placed limits upon the availability of such relief described in § 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). That statute constrains the issuance of a writ of habeas corpus to those instances where the state court's adjudication of the petitioner's claim

> (1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This means that, in most cases, a federal district court will defer to the findings and conclusions of the state courts out of comity and respect for the important role the state courts play in adjudicating federal constitutional issues in state criminal cases. This concept is often referred to as "AEDPA deference." A federal habeas

court reviews the state court's "last reasoned decision" in determining whether a petitioner is entitled to relief. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).

When a party contests the state court's legal conclusions, including application of the law to the facts, § 2254(d)(1) governs. That section consists of two alternative tests: the "contrary to" test and the "unreasonable application" test.

Under the first test, a state court's decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court] [has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the alternative second test of "unreasonable application," the petitioner must show that the state court, although identifying "the correct governing legal rule" from Supreme Court precedent, nonetheless "unreasonably applie[d] it to the facts of the particular state prisoner's case." *Williams (Terry) v. Taylor*, 529 U.S. 362, 407 (2000). "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies [Supreme Court] precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) (emphasis omitted).

Significantly, a federal court cannot grant habeas relief simply because it concludes in its independent judgment that a state court's decision is incorrect or wrong; rather, the state court's application of federal law must be objectively unreasonable to warrant relief. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell*, 535 U.S. at 694. If fair-

minded jurists could disagree on the correctness of the state court's decision, then relief is not warranted under § 2254(d)(1). *Harrington v. Richter*, 562 U.S. 86, 102 (2011). On that subject, the Supreme Court has emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. To be entitled to habeas relief under § 2254(d)(1), "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

Further, AEDPA deference is required even where the state court denied a petitioner's claim without expressly addressing it. In such a case, the federal court must "conduct an independent review of the record to determine what arguments or theories could have supported the state court's decision." *Bemore v. Chappell*, 788 F.3d 1151, 1161 (9th Cir. 2015) (internal quotation marks and alterations omitted). The court must then decide "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a decision of the Supreme Court." *Id*. (internal quotation marks and alterations omitted).

The source of clearly established federal law must come from the holdings of the United States Supreme Court, but circuit court decisions may be persuasive authority for deciding whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 2000). However, circuit law may not be used "to refine or sharpen a general principle of Supreme Court

jurisprudence into a specific legal rule that th[e] Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

As to the facts, the Supreme Court has instructed that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). This means that evidence not presented to the state court may not be introduced on federal habeas review if a claim was adjudicated on the merits in state court and if the underlying factual determinations of the state court were reasonable. *See Murray v. Schriro*, 745 F.3d 984, 999-1000 (9th Cir. 2014); ("After *Pinholster*, a federal habeas court may consider new evidence only on de novo review, subject to the limitations of § 2254(e)(2)."); *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) ("If we determine, considering only the evidence before the state court, that the adjudication of a claim on the merits . . . was based on an unreasonable determination of the facts, we evaluate the claim de novo, and we may consider evidence properly presented for the first time in federal court.").

Two separate statutory subsections govern a federal court's review of state court factual findings:

> Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2) . . . .

*Miller-El v. Cockrell*, 537 U.S. 322, 340 (2010).

A court reviews a state court's factual determination pursuant to § 2254(d)(2) when a petitioner contests the reasonableness of that determination based on the state court record. *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004), *abrogated on other grounds as recognized in Murray*, 745 F.3d 984 (9th Cir. 2014). Under subsection (d)(2), there are two methods generally used to challenge factual findings as unreasonable. "First, a petitioner may challenge the substance of the state court's findings and attempt to show that those findings were not supported by substantial evidence in the state court record. Second, a petitioner may challenge the fact-finding process itself on the ground that it was deficient in some material way." *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012) (internal citations omitted).

Importantly, a "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

Under the second subsection dealing with state court findings of fact, 28 U.S.C. § 2254(e)(1), such factual findings are presumed to be correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. This standard "is demanding but not insatiable," and "deference does not by definition preclude relief."

*Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (internal quotation marks and alteration omitted).

The relationship between subsections (d)(2) and (e)(1) of § 2254 is not entirely clear. In *Taylor v. Maddox*, the Ninth Circuit held that "the presumption of correctness and the clear-and-convincing standard of proof [as set forth in § (e)(1)] only come into play once the state court's fact-findings survive any intrinsic challenge [under § (d)(2)]; they do not apply to a challenge that is governed by the deference implicit in the 'unreasonable determination' standard of section 2254(d)(2)." 366 F.3d at 1000. However, in *Cullen v. Pinholster*, the United States Supreme Court held that new evidence introduced in federal court "has no bearing" on a merits review of a state court's legal conclusions. 563 U.S. at 185.

In *Murray*, the Ninth Circuit explained that the decision in *Pinholster* "eliminated the relevance of 'extrinsic' challenges when … reviewing state-court decisions under AEDPA." 745 F.3d at 999. As a result, the interplay between § 2254(d)(2) and § 2254(e)(1) is unresolved. *Id.* at 1001 (noting that the Supreme Court has, in some cases, assumed that § (e)(1) merely qualifies § (d)(2) and that "we too have continued to struggle with the relationship between §§ 2254(d)(2) and (e)(1) when reviewing state-court factual findings under AEDPA"); *see also Wood*, 558 U.S. at 300 (declining to address the issue). To date, courts of precedent facing this dilemma have not found the differences between § 2254(d)(2) and § 2254(e)(1) determinative under the particular facts before those courts. *See Wood*, 558 U.S. at 304-05 ("Because the resolution of this

case does not turn on them, we leave for another day the questions of how and when § 2254(e)(1) applies in challenges to a state court's factual determinations under § 2254(d)(2).”); *Murray*, 745 F.3d at 1001 (“[W]e do not believe the difference between our two lines of cases is determinative in this case, and thus we need not resolve the apparent conflict to decide this case.”).

If a petitioner satisfies § 2254(d)—either by showing that the state court's adjudication of the claim was contrary to, or an unreasonable application of, Supreme Court precedent, or by establishing that the state court's factual findings were unreasonable—then the federal habeas court must review the petitioner's claim de novo.[7] *Hurles*, 752 F.3d at 778. As in the pre-AEDPA era, a district court considering a habeas claim de novo may draw upon United States Supreme Court and circuit precedent, limited only by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989).

However, if the factual findings of the state court are not unreasonable under § 2254(d)(2), then even on de novo review the Court must apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1) to any facts found by the state courts. *See Pirtle v. Morgan*, 313 F.3d 1160, 1167-68 (9th Cir. 2002). Conversely, if a state court factual determination is unreasonable, the federal court is not limited by § 2254(e)(1) and may consider evidence outside the state court record, except to the extent that § 2254(e)(2) might apply. *See Murray*, 745 F.3d at 1000.

---

[7]      De novo review is also required where the state appellate court did not decide a properly-asserted federal claim or where an adequate excuse for the procedural default of a claim exists. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002); *Dickens v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014) (en banc).

Generally, even if a petitioner succeeds in demonstrating a constitutional error in his conviction, he is entitled to federal habeas relief only if he also "can establish that [the error] resulted in 'actual prejudice.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Under the *Brecht* standard, an error is not harmless and habeas relief must be granted if the federal court has "grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (internal quotation marks omitted). However, some types of claims "are analyzed under their own harmless error standards, which can render *Brecht* analysis unnecessary." *Jackson v. Brown*, 513 F.3d 1057, 1070 (9th Cir. 2008). *Brady* claims are in this category, and if a court has found a *Brady* violation, "it cannot subsequently be found harmless under *Brecht*." *Kyles v. Whitley*, 514 U.S. 419, 436 (1995).

## DISCUSSION

In Claim 1, Petitioner asserts that the prosecution failed to disclose, in violation of *Brady v. Maryland*, evidence that C.W.'s eyes were removed for examination after the victim's body was released to the funeral home and embalmed.

**1.      Clearly-Established Law**

Under the Due Process Clause of the Fourteenth Amendment, the prosecution has a duty to disclose evidence favorable to the defense that is material to guilt or punishment, regardless of whether the defense has requested such evidence. *Brady*, 373 U.S. at 87; *United States v. Bagley*, 473 U.S. 667, 676 (1985). A meritorious *Brady* claim contains three essential components: (1) the evidence must be favorable to the accused,

either because it is exculpatory or because it is impeaching; (2) the government must have withheld the evidence, either intentionally or inadvertently; and (3) the evidence must be material to guilt or punishment, *i.e.*, "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

The duty to disclose favorable evidence applies "irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 83; *see also Giglio v. United States*, 405 U.S. 150, 154 (1972) ("[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor."). It applies not only to the prosecutor but also to the prosecution's agents, such as police officers. *Kyles*, 514 U.S. at 437 (holding that evidence known only to the police, but unknown to the prosecutor, was subject to *Brady* disclosure). Thus, "the individual prosecutor has a duty *to learn* of any favorable evidence known to the others acting on the government's behalf in the case." *Id.* (emphasis added).

Favorable evidence can be exculpatory or impeaching. Exculpatory evidence is evidence tending to show the defendant did not commit the crime, while impeachment evidence is evidence that might have helped in conducting a cross-examination. *Bagley*, 473 U.S. at 677. *Brady* requires disclosure of exculpatory or impeaching *information*, not just exculpatory or impeaching documents or other tangible things. *See id.* ("The constitutional error, if any, in this case was the Government's failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination.").

Undisclosed evidence is material under *Brady*, and its non-disclosure is prejudicial, if a reasonable probability exists that, had the evidence been disclosed, the result of the proceeding would have been different. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682. Exculpatory or impeaching evidence need not be evidence that would have produced an acquittal. *Kyles*, 514 U.S. at 434 ("[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant)."). Rather, the undisclosed evidence need only be such that, "if disclosed and used effectively, it *may* make the difference between conviction and acquittal." *Bagley*, 473 U.S. at 676 (emphasis added). A court, in deciding whether undisclosed evidence is material, must assess the weight and force of the withheld evidence collectively, rather than item by item. *Kyles*, 514 U.S. at 433-34.

As noted above, if a federal court determines that the three *Brady* elements have been met, the court need not conduct an additional prejudice analysis under *Brecht*. *Kyles*, 514 U.S. at 436.

### 2.    In Denying Claim 1, the Idaho Court of Appeals Unreasonably Applied *Brady v. Maryland*, *Kyles v. Whitley*, and *Bagley v. United States*

The Idaho Court of Appeals did not address the initial post-conviction court's finding that C.W.'s eyes were removed before the body was released and embalmed. Rather, the court assumed the eyes were removed post-release and post-embalming, and

denied Petitioner's *Brady* claim nonetheless. Thus, for purposes of determining whether

Petitioner has satisfied § 2254(d)(1), this Court will make the same assumption.

In at least two ways, the state court's decision was based on an unreasonable

application of clearly-established federal law as determined by the United States Supreme

Court.

### A. Assuming Post-Release and Post-Embalming Removal of the Eyes, the State Court's Conclusion that the Evidence Was Not in the Government's Possession or Control Was Unreasonable

Without adopting the post-conviction court's finding that the eyes were removed

before release and embalming of the body, the Idaho Court of Appeals determined that

"the mortuary report was not in the prosecutors' (or their agents') possession or control

and could not be reasonably imputed to them." *Stevens II*, 327 P.3d at 384. The court said

that "the funeral home (which was clearly not a State agent) had sole possession of the

report until . . . 2003 when, responding to an inquiry" from Glen Elam, an "investigator

for the public defender's office, the prosecutor requested the funeral home's files and

forwarded them to the investigator and defense counsel." *Id.*

The Idaho Court of Appeals expressly addressed only the mortuary report. It did

not discuss any of the other evidence offered by Petitioner, including the 2003

recollections of Detective Jim Miller and Detective Joe Miller that C.W.'s eyes were

removed at the funeral home after the body had been released from the hospital, and not

at the time of the autopsy. This Court presumes, however, that the court of appeals

considered all of the evidence other than the mortuary report and determined that it, also,

was not in the State's possession or control. *See Richter*, 562 U.S. at 99 ("When a federal

claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

In doing so, the Idaho Court of Appeals unreasonably applied *Brady*, *Kyles*, and *Bagley*. *Brady* requires disclosure of *information*, not just documents. *Bagley*, 473 U.S. at 677. Here, that information was not limited to the mortuary report—it was the (assumed) fact that the eyes were removed after the body had been released from the hospital. If the eyes were removed after the body was released and embalmed, as the court of appeals stated it assumed, then that information was indeed within the State's control.

This Court agrees with the lower state post-conviction court that "if [C.W's] eyes were removed post-embalming then Dr. Slaughter [the pathologist] and/or Mr. Sonnenberg [the coroner] would have had knowledge of this fact." (State's Lodging C-11 at 2365.) As the pathologist who removed the eyes, Dr. Slaughter obviously knew where and when he removed them. Though Dr. Slaughter could not later remember when he removed the eyes, he was most certainly aware of where and when the eyes were removed *at the time* he removed them. The coroner, Mr. Sonnenberg, also knew the timing of the removal of the eyes because he informed a police detective on December 30, 1996, that C.W.'s eyes had been removed from his body. (State's Lodging A-4 at 325.)

As it did before the state post-conviction court, in this habeas proceeding "[t]he State does not dispute the logic of this argument. Instead, the State has chosen to argue

that Dr. Slaughter and/or Mr. Sonnenberg did not have knowledge of this fact because [C.W.'s] eyes were in fact removed at autopsy." (*Id.*) The State again does not dispute Petitioner's contention that, for purposes of *Brady*, the coroner's office is an arm of the government or that Dr. Slaughter was an agent of the coroner—and therefore "acting on the government's behalf." *Kyles*, 514 U.S. at 437. (Dkt. 23 at 23; Dkt. 28 at 13-16.)

However, the Court need not decide whether Dr. Slaughter and Mr. Sonnenberg were agents of the prosecution, because—assuming post-release and post-embalming removal of the eyes—two police officers *also* knew that fact. In 2003, Detective Jim Miller and Detective Joe Miller both recalled that the eyes were removed at the funeral home after the body was released from State custody. Approximately eight years later, Jim Miller testified at the post-conviction hearing that he (at that later date) believed the eyes were removed at the autopsy. But his change of mind upon the subject—which apparently was not based on a new and different memory—does not call into question his or his brother's earlier independent recollections that were made of record in 2003.

These two police detectives were members of the government's investigative team, and no fairminded jurist could disagree with that conclusion. *See Richter*, 562 U.S. at 102. As such, their knowledge is part of what "the individual prosecutor has a duty to learn[,]" that is, "any favorable evidence known to the others acting on the government's behalf in the case, *including the police*." (emphasis added)). *Kyles*, 514 U.S. at 437 Thus, assuming the eyes were removed sometime after the funeral home took possession of the body on December 29, 1996, Detectives Jim and Joe Miller were aware of that fact at the

time. Hence, that information was within the possession or control of the prosecution's investigatory team.

For these reasons, the state court's conclusion that the State did not have possession or control of *any* of the evidence of post-embalming removal—not just the mortuary report—was based on an unreasonable application of *Brady*, *Kyles*, and *Bagley*. Stated simply, the Idaho Court of Appeals could not have reasonably concluded that the government did not have possession or control of the information while also assuming the eyes were removed after release and embalming. If the eyes were removed after release and embalming, then the memories of the two detectives were accurate. Therefore, at least two police officers "acting on the government's behalf" would have known the information. *Kyles*, 514 U.S. at 437. Pursuant to *Brady* and its progeny, the prosecutor was required to discover, and then disclose, that information.

**B.  *Assuming Post-Release and Post-Embalming Removal of the Eyes, the State Court's Implied Conclusion that the Evidence Was Not Impeaching Was Unreasonable***

The Idaho Court of Appeals also held that the evidence of post-embalming removal was not favorable to Petitioner because, on its face, it was not exculpatory. *Stevens II*, 327 P.3d at 384 ("On the record we have before us, there is little to no basis upon which to conclude the prosecutor or other members of the investigative team would or should have had any reason to believe th[e] fact [that the eyes were removed post-embalming] constituted material exculpatory evidence, such that the evidence must be disclosed."). In addressing these issues, the court again assumed that "the eyes were removed post-embalming." *Id*. The court stated,

MEMORANDUM DECISION AND ORDER - 32

> [I]t was not until Stevens obtained the opinion of several experts during the post-conviction proceedings that any inkling arose indicating the evidence was potentially exculpatory. This is distinguishable from evidence that a prosecutor and/or the investigative team can be reasonably expected to discern as exculpatory—such as a witness's statement identifying an alternate perpetrator than the defendant. Additional analysis, beyond the ken of the prosecutor and investigation team, was necessary in this case to reveal the exculpatory nature of the evidence in question. Under these circumstances, knowledge of the evidentiary significance of the embalming report and/or the timing of the removal of the child's eyes cannot reasonably be imputed to the prosecutor.

*Id.* at 385.

The state court did not address expressly whether the evidence was impeaching, only whether it was exculpatory. This Court presumes that the state court considered that question (*see Richter*, 562 U.S. at 99), and that the state court decided that the evidence of post-release and post-embalming removal was not impeaching for the same reason the state court decided that the evidence was not exculpatory, *i.e.*, because the prosecutor could not have known the evidence was impeaching.

That conclusion was objectively unreasonable for two reasons. First, *Brady* does not require that the exculpatory or impeaching character of the undisclosed evidence actually be known to the prosecutor. Instead, *Brady* and its progeny require only that the undisclosed evidence be favorable, material, and within the control of the prosecution or its agents. Importantly, the significance of any such undisclosed evidence remains, and "under *Brady* an inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment. 'If the suppression of evidence results in

constitutional error, it is because of the character of the evidence, not the character of the prosecutor.'" *Strickler*, 527 U.S. at 288 (quoting *United States v. Agurs*, 427 U.S. 97, 110 (1976)).[8]

Second, the state court's conclusion was unreasonable even if *Brady* did require that the favorable character of the evidence actually be known to the prosecution or its agents. Accepting the court of appeals' assumption that the eyes were removed after the body had been released and embalmed, the impeaching character of that evidence was obvious before trial or, at the very latest, during trial.

Here, it is not only the (assumed) fact that the eyes were removed after *embalming* that would have been apparent to the members of the prosecution's investigative team—it is also the fact that the eyes were removed after the body had been *released to the funeral home*, which established a break in the chain of custody of the eyes. The evidence of post-release and post-embalming removal of the eyes is classic chain-of-custody evidence, and both police and prosecutors are well aware of the importance of establishing a chain of custody of evidence.

When Dr. Crawford first examined the eyes and concluded that the damage he saw was highly specific to shaken-baby syndrome, it would have been clear to any reasonably

---

[8] The State attempts to buttress the state court's conclusion that the evidence was not favorable to the defense by arguing that the court did not require that the exculpatory (or impeaching) value of the evidence be known to the prosecution team. Instead, asserts the State, the court of appeals merely determined, again, that any evidence of post-embalming removal was not within the prosecutor's or her agents' control. (Dkt. 28 at 14.) However, this argument lacks merit, given the plain language used by the court of appeals that (1) "[a]dditional analysis, beyond the ken of the prosecutor and investigation team, was necessary in this case *to reveal the exculpatory nature of the evidence* in question" and (2) the prosecutor did not have actual or imputed "*knowledge of the evidentiary significance*" of that evidence. *Stevens II*, 327 P.3d at 385 (emphasis added).

competent prosecutor or police officer that the eyes were very important pieces of evidence. The impeachment value of the evidence of post-embalming removal should have been obvious as soon as the prosecution was aware that the eyes might contain evidence of the cause of death. The importance of such evidence was further emphasized because two doctors examined the eyes and testified at trial, but only one of them observed macular folds in the eye tissue. Dr. Kent, who examined the eyes *before* C.W. died, testified that he did *not* see macular folding. Dr. Crawford, who (assuming post-embalming removal) examined eyes that had been removed *after* the body was released to the funeral home, testified that the folds *did* exist. The release and embalming of C.W.'s body was a potential reason for this discrepancy other than the possibility that Dr. Kent simply missed the presence of macular folds or did not have the right equipment to see them.

The child's eyes were out of the State's custody for at least a day between the release of the body and the assumed post-embalming removal of the eyes. This chain-of-custody anomaly is a reason for calling into question Dr. Crawford's findings because the condition of the evidence (the eyes) could have changed after the victim's death (and after Dr. Kent's examination), but before Dr. Crawford's examination. *See Bagley*, 473 U.S. at 677 ("The constitutional error . . . was the Government's failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination."). Therefore, because both Dr. Crawford and Dr. Kent were state witnesses, the impeaching character of the evidence should have been obvious to the prosecutor

when she was constructing her case and preparing her witnesses for trial. At the very latest, the impeachment value of the evidence was clear during trial when the two doctors testified about their findings upon their respective examinations of the eyes.

For the foregoing reasons, the court of appeals unreasonably applied *Bagley* in ruling that the evidence of post-embalming removal, which the court assumed was true, was not impeaching. That evidence plainly "might have been helpful in conducting the cross-examination" of an expert testifying as to his examination of scientific evidence and conclusion as to the cause of death drawn from that evidence—here, Dr. Crawford's examination of C.W.'s eyes and his conclusions that C.W. was violently shaken. *Bagley*, 473 U.S. at 677. Finally, the evidence became obviously impeaching, and therefore favorable to the defense, no later than Dr. Kent's and Dr. Crawford's trial testimony. The Court finds that no fairminded jurists would disagree. *See Richter*, 562 U.S. 86, 102

Having determined that the state court unreasonably applied clearly-established federal law, this Court will now analyze Petitioner's *Brady* claim de novo.

### 3.     On De Novo Review, Petitioner Is Entitled to Habeas Relief on His *Brady* Claim

Even if a petitioner satisfies § 2254(d)(1) by showing that the state court unreasonably applied clearly-established federal law, a habeas court—in reviewing the claim de novo—must still presume any state court factual finding to be correct under 28 U.S.C. § 2254(e)(1) unless that finding is unreasonable under § 2254(d)(2). *See Pirtle*, 313 F.3d at 1167; *Murray*, 745 F.3d at 1000. The parties agree that this Court properly can review the factual finding of the state post-conviction court that C.W.'s eyes were

removed before the body was released and embalmed, even though the Idaho Court of Appeals did not adopt that finding. (Reply, Dkt. 23 at 3-18; Sur-Reply, Dkt. 28, at 4-5.)

If this Court must defer to the post-conviction court's finding that the eyes were removed at the autopsy, before the body was released and embalmed, then Petitioner's *Brady* claim would fail because there would have been nothing for the prosecution to disclose and the evidence of post-embalming removal would not have been material. Therefore, the Court must first decide whether it is bound by that factual finding.

In making that decision, the Court is mindful that although a federal court in habeas must "give considerable deference to the state courts, 'AEDPA deference is not a rubber stamp.'" *Garcia v. Long*, 808 F.3d 771, 779 (9th Cir. 2015) (quoting *Anderson v. Terhune*, 516 F.3d 781, 786 (9th Cir. 2008)). Hewing to that template, the Court concludes for the reasons that follow that the finding of pre-release and pre-embalming removal is unreasonable under § 2254(d)(2), and the Court therefore need not apply the presumption of correctness to that finding under § 2254(e)(1).[9]

---

[9] Though the Court primarily analyzes the state court's factual finding under § 2254(d)(2), it also concludes that Petitioner has satisfied § 2254(e)(1). Specifically, for the reasons provided in this section, the Court concludes both that the initial post-conviction court's factual finding of the timing of the removal of the eyes was unreasonable, and that Petitioner has rebutted that finding by clear and convincing evidence. Therefore, the precise interaction and any differences between §§ 2254(d)(2) and (e)(1) are not implicated here.

**A.** *The Court Need Not Defer to the Idaho Post-Conviction Court's Factual Finding that C.W.'s Eyes Were Removed Before Release and Embalming*

   i.  The evidence presented in state court

The eye removal issue centered on whether C.W.'s eyes were removed at the autopsy or, as Petitioner claims, after the body had been released to the funeral home and embalmed. The post-conviction court found that four people were at the autopsy of C.W.: (1) Dr. Ronald Slaughter, the pathologist who performed the autopsy and, at some point, removed the eyes; (2) Detective Jim Miller; (3) Dave Sherner from the coroner's office; and (4) then-Sergeant (later Lieutenant) Gene Trakel. (State's Lodging C-11 at 2366.) Although the county coroner, Erwin Sonnenberg, testified during post-conviction proceedings that he believed he was at the autopsy, all of the other evidence indicates that only those four individuals were present. The autopsy reports do not note that the eyes were removed at the autopsy.

Dr. Slaughter testified multiple times about removing C.W.'s eyes for further testing, but he never said *when* he removed the eyes. During the first trial, which ended in a hung jury, Dr. Slaughter said that he removed the eyes, at the direction of the coroner, and placed them in a fixative to preserve them. (State's Lodging A-7 at 1125-26.) There was no mention of when the eyes were removed, although, if the coroner advised Dr. Slaughter to remove the eyes, that conversation likely took place before or after the autopsy, as the coroner was not present at the autopsy. (State's Lodging C-11 at 2366.)

In the second trial, Dr. Slaughter gave these answers to the prosecutor's questions:

   Q.  Doctor, with respect to [C.W.'s] eyes, did you perform
      a procedure to remove [the] eyes?

> A.   Yeah, after consulting with Dr. Garrison and Dr. Ray
> [two other experts], I knew the eyes would be
> important and I'm not an ophthalmology pathologist
> . . . so I just took the eyes out and put in a fixative to
> make sure that they stayed the way they are now and
> sent it to a pathologist specially trained in that area.
>
> Q.   And so you actually packaged them and sent them to
> Dr. Brooks Crawford?
>
> A.   Yes.

(State's Lodging A-9 at 411.) Once again, no one asked Dr. Slaughter when he removed

the eyes, though Dr. Slaughter did testify that he had these discussions with Drs. Garrison

and Ray about the importance of the eyes before the autopsy. (*Id*. at 415.)

By the time he testified during proceedings on Petitioner's motion for a new trial,

Dr. Slaughter vaguely recalled removing C.W.'s eyes, but he did not remember when:

> Q.   Dr. Slaughter, just to move on to the issue of the eyes,
> I'm sure you're aware of that issue; correct?
>
> A.   Yeah. I was told today of the issue of the eyes, or
> maybe yesterday.
>
> Q.   I notice in . . . the final autopsy report and preliminary
> autopsy report . . . , there is no mention in there that
> you removed the eyes during the autopsy.
>
> A.   I just looked for that and you're right, there's no
> mention of it.
>
> Q.   In fact, you didn't remove the eyes during autopsy, did
> you?
>
> A.   Honestly, I don't remember the exact instant that I
> removed the eyes. I do vaguely remember—remember
> this is almost ten years ago—removing the eyes. It's
> not something we normally do. This report that has the
> gross, that lists all the organs and heart and lungs, I do
> that after I've done the autopsy from a template

because we almost never remove the eyes. The eyes are not listed in that template. So it's likely I just overlooked dictating how I removed the eyes or what their weight was or anything else.

Q.    At some point you removed the eyes?

A.    Correct.

Q.    What made you decide to remove the eyes?

A.    From what I can recall and from looking at my previous testimony, I think I spoke to someone with more experience in this area in Washington, and they recommended that I remove the eyes.

Q.    Did you speak with Dr. Garrison in Pocatello?

A.    Yes.

Q.    And he recommended that you remove the eyes?

A.    Correct.

Q.    And the reason he did that is because he explained to you that in alleged shaken baby cases the removal of the eyes is important to the evidence of shaking?

A.    I don't remember the exact reason, but he did ask me to take the eyes.

Q.    Do you recall when you removed the eyes?

A.    No, I do not.

. . . .

Q.    What time of day was it when you removed the eyes?

A.    I have no idea. I don't remember what time of day it was when I did the autopsy.

. . . .

Q.    How did the body arrive for you to take the eyes?

A.     I don't know. As far as I know, I took the eyes at
       autopsy, which is the body was stored in our cooler.

Q.     But that was not noted in either of your autopsy
       reports?

A.     Correct, because the eyes are not part of my normal
       dictating template. And I just didn't mention it
       specifically also since I wasn't keeping the eyes. The
       eyes were taken to be sent out. And that's why there
       are no weights or anything. That's why it's not on my
       final diagnosis, for instance. I didn't examine the eyes
       microscopically, so I had no reason to include them in
       my report.

. . . .

Q.     You're speculating here, aren't you, because you don't
       have a memory?

A.     I am speculating.

. . . .

Q.     As far as the issue of the body being embalmed when
       the eyes are removed, you have no specific memory as
       to whether it was embalmed?

A.     I have no specific memory of the exact time I took the
       eyes. I'm assuming I took them at the time of autopsy
       because it would be unusual for me to do it any other
       time. But I don't have a specific memory.

(State's Lodging A-13 at 41-50, 58.)

       Dr. Slaughter testified that he did not know what time of day it was when he

performed the autopsy. Though in answer to the question about the time of day the eyes

were removed he left a possible impression that the eyes were taken during the autopsy,

he clarified shortly thereafter in his testimony that he was only assuming and speculating that he removed the eyes at autopsy.[10]

After a defense investigator initially raised the issue of the chain of custody of the eyes, the prosecutor asked Detective Jim Miller to investigate the timing of the removal. Detective Miller's subsequent investigative report contains his conclusion that C.W.'s eyes were removed after the autopsy, after the body was released to the funeral home, and after the body was embalmed. The detective remembered C.W.'s eyes "being collected a day or two [after the autopsy] while [C.W.] was at the funeral home." (State's Lodging A-4 at 325.) Detective Jim Miller's brother, Detective Joe Miller, corroborated the conclusion, saying that "there had been *at least one trip made to Dakan Funeral*

---

[10] The State contends in its briefing that "Dr. Slaughter discussed his *removal of C.W.'s eyes during the autopsy*." (Dkt. 15 at 32 (emphasis added).) A close reading of the transcripts, however, indicates that this is not precisely the case. In all of his court appearances, Dr. Slaughter generally testified about his examination of the victim's body, which occurred during the autopsy, but he never pinned down a particular time frame with respect to the removal of the victim's eyes. An inference could, of course, be drawn that Dr. Slaughter was still talking about the autopsy when he testified as to the removal of the eyes at the first and second trials.

Arguably, an even stronger—and *opposite*—inference could be drawn from Dr. Slaughter's testimony at Petitioner's preliminary hearing. In that hearing (his earliest testimony in this case) Dr. Slaughter gave an answer that potentially can be construed as testimony that he removed the eyes *after* the autopsy:

> Q.    And Doctor, *after you completed the autopsy*, *did you—were there documented retinal hemorrhages* in [C.W.]?
>
> A.    *Yes*. *I retrieved the eyes* and sent them to the University of California at San Francisco where they examined by an ophthalmologic pathologist . . . and he documented retinal hemorrhages.

(State's Lodging A-41 at 96 (emphasis added).) It could be inferred that, despite the break in the prosecutor's question, Dr. Slaughter was speaking about his actions after the autopsy, given that the prosecutor prefaced the question with that time frame, and Dr. Slaughter used the word "retrieved."

However, these ambiguities prove nothing. Rather, they show, at most, that Dr. Slaughter never testified clearly as to when he removed the victim's eyes.

**MEMORANDUM DECISION AND ORDER - 42**

*Chapel* by the coroner's office *to collect [C.W.'s] eyes* and the tissue samples." *Id*. at 325-26 (emphasis added). And although the autopsy report states that Dr. Slaughter performed biopsies of tissues from C.W.'s face, Detective Jim Miller's report concluded that facial tissue samples likely were taken after the body was released, at the same time the eyes were removed.

Detective Jim Miller came up with the following timeline, based on his interviews with witnesses and his handwritten notes:

| | |
|---|---|
| 12-27-96 (Friday) | <u>At about 1530 hrs</u>, Meridian Police respond to [Petitioner's address]. |
| 12-28-96 (Saturday) | <u>1038 hrs</u>. [C.W.] dies at St Luke's Hospital. |
| *12-29-96 (Sunday)* | <u>*0800-0930 hrs*</u>, Lt. Gene Trakel and I attend [C.W.'s] *autopsy performed by Dr. Slaughter*. |
| | <u>1145 hrs</u>, Ken Hestead with Dakan Funeral Chapel picks [C.W.] up. |
| | <u>1230 hrs</u>, *[C.W.] arrives at Dakan Funeral Chapel. Doug Reinke notes [C.W.'s] eyes are brown*, and notes only bruises on his body. |
| | <u>*1230-1430 hrs*</u>, *Doug Reinke embalms [C.W.]* |
| *12-30-96 (Monday)* | Paul Kerr [with the funeral home] met with [C.W.'s parents] to make arrangements. Viewing set for 1700 hrs on 12-31-96, and funeral set for 1100 hrs on 1-1-97. |
| | Paul Kerr said normally he would have prepared [C.W.] for the viewing tomorrow, but for some reason he doesn't. |
| | <u>1730 hrs</u>, *Det. Joe Miller talks to Irwin Sonnenberg who advises [C.W.'s] eyes have been taken*. |

| | |
|---|---|
| 12-31-96 (Tuesday) | <u>1400 hrs</u>, [C.W.'s mother] gives permission for x-rays. |
| | <u>1530 hrs</u>. I call Dakan and was told the coroner has already come and taken [C.W.].<br>Paul Kerr states he transported [C.W.] to St. Luke's for x-rays. |
| | <u>1700 hrs</u>. [C.W.'s] viewing has to be postponed because body is not ready. |
| 1-1-97 (Wednesday) | Paul Kerr has trouble repairing the incisions in [C.W.'s] body. |
| | <u>About 0900 hrs</u>, [C.W.'s] viewing is conducted at Dakan. |
| | <u>1100 hrs</u>, graveside services are held at Hillcrest Memorial Gardens. |

(*Id*. at 330-31 (italics added).)

Neither Detective Jim Miller nor Lt. Gene Trakel, both of whom attended the autopsy, could later remember the eyes being removed at that time, though at least one of these detectives may have left the autopsy before it was completed. (*Id*. at 325, 330; State's Lodging C-12 at 724.) Jim Miller testified that C.W.'s autopsy was the first he had seen, and he believed that if he "was present when the eyes were taken from [C.W.'s] body [he] would have remembered that." (State's Lodging C-12 at 703.)

Detective Jim Miller's investigation found that C.W.'s body arrived at the funeral home at approximately 12:30 p.m. on December 29, 1996, after the autopsy was completed and the body was released from State custody. Miller reported that C.W.'s "eyes were intact and no facial bruising samples had been taken" prior to the embalming,

based upon the mortuary report. (State's Lodging A-4 at 331.) C.W.'s body was embalmed by Doug Reinke between 12:30 and 2:30 p.m. on that same day, and Miller concluded that "at some point after that, [C.W.'s] eyes were removed and tissue samples of the bruising were taken." (*Id.*) Detective Jim Miller's notes regarding the coroner's discussion with Detective Joe Miller could suggest that the eyes were removed at the funeral home on Monday, December 30, 1996—the day after the body was released from State custody and embalmed. Detective Jim Miller's handwritten notes, made during the initial investigation of the crime, confirm that the coroner informed Detective Joe Miller, on December 30, 1996, that the eyes had been removed:

> 12-30-96    1520 hrs.  I called Dakan Funeral Chapel . . . and was advised [the] services will be on 1-1-97, at 1100 hrs.
>
> 1730 hrs (approx.), *Joe (Miller) speaks with Irwin Sonnenberg* [the coroner]; *[C.W.'s] eyes have been taken*, he will check on long bone x-rays being done.

(*Id.* at 325.)

Had the eyes been removed at the autopsy on December 29, there may have been little reason on December 30 for the coroner to specifically inform Detective Joe Miller of their removal. However, Detective Jim Miller later agreed with the prosecutor, during post-conviction proceedings in 2011, that when Sonnenberg informed Detective Joe Miller on December 30 that the eyes had been removed, Sonnenberg "could have just as easily [been] referr[ing] to the autopsy the day before," and that this statement could simply have been in response to the detective's attempts to "confirm[] whether or not

certain things had been done, per [the prosecutor's] request." (State's Lodging C-12 at 720, 724.)

Alternatively, Detective Jim Miller's report noted that the eyes could have been removed on December 31, 1996, when C.W.'s body was taken back to the hospital for long bone x-rays. (State's Lodging A-4 at 325.) Jim Miller testified at the post-conviction hearing that he had changed his opinion on when the eyes were removed. At that hearing, he said he now believed they were removed at the autopsy, "probably after [he] left." (State's Lodging C-12 at 724.)

As Detective Jim Miller's 2003 investigation recognized, the mortuary report indicates that the eyes were still in C.W.'s body when C.W. was embalmed and that facial tissues from the body had not yet been taken. The embalming report was prepared by the funeral home that took custody of C.W.'s body after the State had released the body once the autopsy had been performed. The report noted that C.W.'s eyes were "Brown." (State's Lodging A-4 at 334.) Because Doug Reinke, the mortician who wrote the report, embalmed C.W. *after noting that his eyes were brown*, this evidence strongly suggested C.W.'s eyes had not been removed during the autopsy, but instead must have been removed sometime after Reinke embalmed the body.

Mr. Reinke testified during post-conviction proceedings (more than fourteen years later) that he did not specifically remember embalming C.W.'s body. However, he said that his having made a record that C.W.'s eyes were "brown" meant, unsurprisingly, that the eyes were present in the body at the time he performed the embalming procedure.

Reinke also testified that he could not have mistaken C.W.'s actual eyes with anything else that may have been placed in the eye sockets:

> Q.    Do you know whether or not his eyes were still present?
>
> A.    I noted the color of his eyes as being brown.
>
> Q.    And how would you have known that?
>
> A.    By—
>
> Q.    By looking at his eyes?
>
> A.    By seeing them, yes.
>
> . . . .
>
> Q.    Were his eyes present at the time of embalming?
>
> A.    Based on seeing them as being brown I would believe so.
>
> . . . .
>
> Q.    Have you seen cases where bodies that you're embalming, where the eyes had been removed?
>
> A.    Yes.
>
> . . . .
>
> Q.    During the preparation of the body for viewing or burial, is there ever a prosthetic device that is put into the eye socket?
>
> A.    Yes. There is something that—there are a couple of methods that we use to try to regain the form of the eye, the natural form of the eye.
>
> Q.    And what are those methods?

A.  Well, in an adult, there is a prosthetic eye that is basically a marble of some type of plastic material that can be used to replace the eye.

Oftentimes we use cotton because of its absorbency to—because of the possibility of further leakage of the fluids or a small amount of the fluids, we'll use a cotton pellet or cotton ball in the base of the eye socket.

. . . .

Q.  Could you have mistaken any of these items that would be placed in the eye socket with a natural eye?

A.  I wouldn't know under what circumstances I would do that. It would not be a brown color typically.

(State's Lodging C-12 at 580-84.)

On cross-examination, Reinke explained that an eye cap was also sometimes used

in embalming but that he could not have mistaken an eye cap for a brown eye:

Q.  And what's an eye cap?

A.  In preparing . . . human remains for viewing and usually just prior to embalming taking place, the eyelids are closed. And the eye cap is usually inserted under the eyelids for two reasons really. One, you see the perforated ridges on there. That helps keep the eyelids closed. The second reason for an eye cap is over time a person's eye, and eyeball, can dehydrate.

Q.  And shrink up?

A.  Particularly the pupil will become indented.

. . . .

Q.  . . . This eye cap that you just identified as one that you typically use was what color?

A.  A flesh color, typically.

**MEMORANDUM DECISION AND ORDER - 48**

|     |     |
| --- | --- |
| Q.  | With just a shade of what? |
| A.  | Pink I would say. |
| Q.  | . . . It's possible that you did not see [C.W.'s] eyes when you wrote that down brown, isn't it? |
| A.  | I don't know why I would have written brown. |
| Q.  | Right. But I'm asking, is it possible that you just made a mistake? |
| A.  | I just can't see that. |

(*Id*. at 587-88.)

Reinke acknowledged that his report did not include all of the visible marks that C.W. had on his body. For example, Reinke reported that the body had "Bruises," but wrote nothing in the space provided for "Evidence of Surgery," even though there would have been incisions and stitches on the body as a result of the autopsy performed by Dr. Slaughter. (*Id.* at 590; State's Lodging A-4 at 334.) But Reinke did indicate on the report that an autopsy had been performed, so it was not as if he actually missed the autopsy incisions on C.W.'s body. (State's Lodging A-4 at 334.) It is also possible that Reinke did not note the autopsy incisions as surgery because he did not consider an autopsy to be "surgery," which generally occurs while the patient is alive.

Another employee from the funeral home, Paul Kerr, testified during post-conviction proceedings that on December 31, 1996, when he was "just start[ing] to get [C.W.] prepared" for viewing, he received a call requesting that C.W.'s body be taken back to the hospital for long bone x-rays. (State's Lodging C-12 at 602-05.) Kerr then accompanied the body to the hospital and remained in the hallway while C.W.'s body

was taken into the x-ray room. (*Id*. at 604.) When the x-rays were completed 15 or 20 minutes later, Kerr took the body back to the funeral home.

After returning to the funeral home, Kerr prepared C.W.'s body for viewing. He noticed "there were tissue samples taken out of [C.W.'s] face and those were still pretty fresh." (*Id.* at 606.) They were so fresh and moist that Kerr had "a very hard time getting the wax [filler] to stick into those wounds." (*Id*.) Kerr was unable to "get[] those incisions dried out in order to make it to the time of the viewing." (*Id*. at 607.) The viewing had to be postponed. (*Id*.)

When asked about the significance of what he had described as "fresh and moist" wounds, Kerr testified that the wounds would have already been dry if the tissue samples had been taken a day or two earlier. (*Id*.) In Kerr's opinion, the facial wounds from taking the tissue samples occurred "somewhere" within twelve hours of when he prepared C.W. for viewing. (*Id*. at 608.) Kerr testified that if the tissue samples from the face had been taken on December 29, as noted in the autopsy report, that would be "[d]efinitely inconsistent" with the fact that the wounds were still moist on December 31: "[I]f they were done at that time [on December 29] we would have had time to start working on those so we wouldn't miss our viewing deadline." (*Id*. at 610.)

Kerr's testimony suggested that someone—either the pathologist, the coroner, or someone else—removed facial tissue (and thus had the opportunity to remove the eyes as well) a day or two after the body was embalmed—that is, on December 30 or 31. If the

cuts removing the facial tissue were indeed made after embalming, it would also explain why Reinke's mortuary report did not note any facial lacerations on C.W.'s body.

Detective Jim Miller testified during post-conviction proceedings that he interviewed Kerr as part of his 2003 investigation. Miller remembered Kerr stating "that he normally would have prepared [C.W.'s] body on the 30th," but that "there was a very good possibility he didn't do so because he was waiting for the coroner's office to come out" to the funeral home. (*Id.* at 706.) The coroner, Mr. Sonnenberg, thought he was at C.W.'s autopsy—even though he wasn't—and Sonnenberg told Joe Miller on December 30, 1996, that C.W.'s eyes had been removed. Collectively, this evidence supports an inference that Sonnenberg might have accompanied Dr. Slaughter to the funeral home on December 30 and witnessed Dr. Slaughter remove C.W.'s eyes at that time.

However, Kerr's recollection does not establish that Sonnenberg, Slaughter, or anyone else actually went to the funeral home to retrieve the eyes. Detective Joe Miller testified that he remembered "some trips" between the coroner's office and the funeral home and recalled, in 2003, that those trips were to collect the eyes. But, by the time of the post-conviction hearing in 2011, Joe Miller did not remember the purpose of those trips, nor could he recall "whether it was trips the coroner was taking or it was that [C.W.'s] body was moving in between those two locations." (*Id.* at 742-43.)

As discussed *passim* in this decision, *when* the eyes were removed is of critical importance because Petitioner offered expert evidence that the macular or perimacular folds seen in C.W.'s eyes—which, as Dr. Crawford testified, were "very highly specific"

to shaken-baby cases (State's Lodging A-9 at 776)—were, or at least could have been, caused by postmortem embalming rather than by premortem shaking. The possibility that this macular folding occurred after C.W.'s death was supported by Dr. Kent's trial testimony that he did not see any such folding when he examined C.W.'s eyes during life. Though Dr. Kent stated that he could have missed seeing the folds, ophthalmologist Dr. Steven Kane stated during post-conviction proceedings that, had the macular folds been present in C.W.'s eyes when Dr. Kent examined them, Dr. Kent would, in fact, have noticed the folds. (State's Lodging C-43 at 2 ("I am unaware of an instance or published report where perimacular folds were present but were not visible during life, except when the eyes were completely filled with blood thus obscuring any direct visualization . . . . [T]his was not the situation in the case of [C.W.]").)

Petitioner also submitted affidavits by Dr. Cyril Wecht, a forensic pathologist, who stated that there was "no vital reaction, i.e., tissue response to injury or hemorrhage, within the retina and maculae folds" in C.W.'s eyes. (State's Lodging A-29, Ex. C-2 to Brief in Supp. of Mtn. for New Trial.) Dr. Wecht also stated that embalming fluid would have damaged the retinal layers and caused them to "appear as peri-macular folds." (*Id.*) Finally, Wecht stated, "To a reasonable degree of medical . . . and scientific certainty, it is my opinion that the postembalming removal of the eyes caused the damage to and around the macular and the retinal folds; or at the very least, that such a mechanism of injury could not possibly be ruled out." (*Id.*)

Forensic pathologist Patrick E. Lantz also provided affidavits regarding the macular folding in C.W.'s eyes. Dr. Lantz averred that the macular folding was "*not consistent with occurring during life*." (State's Lodging A-29, Ex. C-3 to Brief in Supp. of Mtn. for New Trial (emphasis added).) Dr. Lantz stated that "[m]ost, if not all the retinal detachments in both eyes appears artifactual consistent with the postmortem period or processing"—in other words, the folding likely occurred after C.W.'s death. (*Id.*)

Dr. Crawford submitted a rebuttal affidavit, stating that the photographs of the eyes taken while C.W. was alive were of poor quality and that he believed C.W.'s eyes "were removed properly and not damaged during retrieval." (State's Lodging C-42 at 3-4.) However, Dr. Crawford acknowledged that there was no way he could determine, from his own examination, "whether the eyes had been removed before or after the body had been embalmed." (*Id.* at 2.) Dr. Crawford stated that he disagreed with the conclusions of Drs. Wecht and Lantz and offered to send them additional slides that "show[ed] the hemorrhages they did not see, but [Petitioner] declined that offer." (State's Lodging A-6 at 691.)

Dr. Wecht took issue with Dr. Crawford's affidavit by stating that Dr. Crawford failed to take photographs of the eyes, to make "appropriates notes," or to "undertake[] necessary investigative studies," which rendered his opinions suspect. (States Lodging C-40 at 3.) Dr. Lantz said that Dr. Crawford's eye pathology report conflicted with his affidavit and trial testimony (a conflict with which the post-conviction court later agreed,

at least as to some of that trial testimony). Dr. Lantz also stated that the photographs taken of the eyes while C.W. was alive "are of adequate quality to conclude that a perimacular retinal fold was not present in the retina . . . during life," and that it was impossible for perimacular folds to be diagnosed by examining the microscopic sections of the eyes submitted by Dr. Crawford. (State's Lodging C-45 at 2.)

Finally, Petitioner presented circumstantial evidence that one of the prosecutors might have been aware of some sort of chain-of-custody issue with C.W.'s eyes prior to being notified by defense investigator Elam in 2003. A "sticky note" written by Mr. Sonnenberg's former secretary indicates that prior to Mr. Elam's prompting the 2003 investigation by Jim Miller, the prosecutor called the coroner's office seeking Dr. Crawford's contact information because she "need[ed] to know chain of custody of eyes." (State's Lodging C-17, State's Ex. 149; C-18, Ex. DD.) Although the note is dated December 9, 1996, that cannot possibly be correct, as C.W. died on December 28, 1996. The phone number left by the prosecutor, however, was an "old" number for the prosecutor's office, used before the office relocated to the new Ada County Courthouse in 2002. (State's Lodging C-12 at 638-41.) Further, the post-conviction court appears to have accepted Petitioner's contention that the message was left "sometime before the second trial" in 1998. (State's Lodging C-11 at 2365.)

    ii.    <u>The state post-conviction court's finding of pre-release and pre-embalming removal</u>

In considering Petitioner's *Brady* claim, the post-conviction court first set forth the following undisputed facts:

[C.W.] died on December 28, 1996, and his autopsy was scheduled for 8 a.m. December 29, 1996. [C.W.'s] autopsy was performed by Dr. Slaughter at St. Luke's. Detective Jim Miller, Sergeant Gene Trakel and Dave Sherner attended the autopsy. At approximately 11:45 a.m. Ken Hestead took [C.W.'s] body to Dakan Funeral Chapel (Dakan). From 12:30-2:30 p.m. [C.W.'s] body was embalmed by Mr. Reinke at Dakan. Mr. Reinke's embalming report notes that [C.W.'s] eyes are brown. [C.W.'s] body was at Dakan all day on December 30. The viewing was scheduled for 5 p.m. December 31. Between 1:30 and 3 p.m. on December 31, mortician Paul Kerr took [C.W.] from Dakan to St. Luke's for a long-bone x-ray. The x-ray took approximately 15-20 minutes, and Mr. Kerr remained outside the x-ray room the whole time. Mr. Kerr testified that [C.W.'s] body looked the same before the x-rays as it did after. Mr. Kerr then returned to Dakan with [C.W.'s] body to prepare it for viewing. Mr. Kerr was unable to prepare [C.W.'s] body in time, and the viewing had to be postponed until January 1, 1997.

(State's Lodging C-11 at 2366 (internal citations omitted).) The parties agreed that "[s]ometime between 8:00 a.m. December 29 and December 31, [C.W.'s] eyes were removed and tissue samples were taken from his face." (*Id.*) The question was whether the eyes were removed on the morning of December 29 at the autopsy (the State's position) or after the body was released and embalmed, either at the funeral home on December 30 or at the hospital on December 31 (Petitioner's position).

The post-conviction court resolved the conflicting evidence as follows, which the Court recounts in detail as necessary for consideration of Petitioner's *Brady* claim:

This issue appears to have arisen sometime after trial when irregularities started to come to the attention of Stevens' attorneys' investigator, Glen Elam. Mr. Elam noticed there was no record concerning the chain of custody for [C.W.'s] eyes other than Dr. Slaughter's testimony at a preliminary hearing. Mr. Elam also learned Dr. Slaughter's final autopsy report did not document any removal of [C.W.'s] eyes. Mr.

Elam then discovered that after [C.W.] was embalmed at the funeral home, his body was taken back to the hospital on December 31. Mr. Elam has testified at hearing that all of these facts struck him as unusual. In August 2003, Mr. Elam contacted the prosecutor's office to inquire about these irregularities. The prosecutor asked Detective Jim Miller to investigate Mr. Elam's concerns. Jim Miller prepared a report which ultimately became the basis for Mr. Stevens' claim.

In the report, Jim Miller comes to the conclusion that [C.W.'s] eyes were removed after his body was embalmed. This conclusion was based upon several findings. First, neither Jim Miller nor Gene Trakel remembers [C.W.'s] eyes or tissue samples being removed at autopsy. However, Jim Miller now admits that he does not know whether he stayed until the end of the autopsy. Second, Mr. Reinke's embalming report notes that [C.W.'s] eyes are brown. Stevens argues that Mr. Reinke could not have noted that [C.W.'s] eyes were brown unless the eyes were in the body. Third, the embalming report has sections for "evidence of surgery" and "mutilation," but these sections were left blank. Additionally, the embalming report notes that there are bruises on [C.W.'s] forehead and around his eyes despite the fact that Dr. Slaughter said he removed biopsies of [C.W.'s] bruises at autopsy. Fourth, Jim Miller's report states that Detective Joe Miller told Jim Miller he thinks the eyes and tissue samples were collected at Dakan by Doug Tucker. However, Doug Tucker maintains that he has never removed eyes from any body at Dakan. Fifth, Mr. Kerr told Jim Miller he normally would have prepared [C.W.'s] body on December 30, but for some unexplained reason he waited until December 31. Stevens suggests the reason for the wait may have been because [C.W.'s] eyes and tissue samples were actually removed on December 30. Sixth, Mr. Kerr testified that he was unable to prepare [C.W.'s] body on December 31 because the wounds on [C.W.'s] face were still moist. According to Mr. Kerr these wounds should have taken approximately 12 hours to dry. Stevens argues that because the wounds were still moist, the tissue samples could not have been removed at autopsy. Finally, Stevens points out that Dave Sherner's notes from the autopsy do not list Mr. Sonnenberg as being present.

The State responds by offering various explanations for the unusual facts of this case. First, the State claims the reason Jim Miller and Gene Trakel don't remember the removal of the eyes or tissue is they did not stay for the entire autopsy. Second, the State points to Dr. Slaughter's testimony stating, "as far as I know, I took the eyes at autopsy." Dr. Slaughter also testified that the most likely reason why the removal of the eyes was not noted in the autopsy report is that his autopsy report templates do not have an area for eye notations. However, Dr. Slaughter went on to say that, "I'm assuming I took them at the time of autopsy because it would be unusual for me to do it at any other time. But I don't have a specific memory." Third, Dr. Slaughter's final autopsy report appears to indicate that he took biopsies of [C.W.'s] face at autopsy. Fourth, Joe Miller never said that December 30 was the day [C.W.'s] eyes were removed. He simply relayed this information to Jim Miller on December 30. Joe Miller never said what day the eyes were taken. Fifth, only licensed staff would have had access to [C.W.'s] body at Dakan, and neither Reinke nor Kerr remembers anyone from the coroner's office coming to Dakan on December 30. Finally, Mr. Sonnenberg testified that he actually was at [C.W.'s] autopsy, but doesn't recall when the eyes were taken.

(*Id.* at 2366-67 (internal citations omitted).)

The court then stated that both parties "made a compelling case for their version of events, but each version has its flaws":

The most compelling evidence in support of Stevens' version of events comes from the two morticians at Dakan. First, Mr. Reinke's report notes that [C.W.'s] eyes are brown. The most logical explanation for this notation is that [C.W.'s] eyes were still in his body at the time of embalming. However, there are other potential explanations. Possibly, Mr. Reinke was just careless in filling out the embalming report. Stevens' second compelling piece of evidence comes from Mr. Kerr. Mr. Kerr testified that [C.W.'s] open wounds should have taken approximately 12 hours to dry. He also testified that when he began preparing [C.W.'s] body at noon on December 31 the wounds were still moist. This testimony suggests [C.W.'s]

tissue samples were taken the morning of December 31 or the evening of December 30.

The State has equally strong evidence in support of its claim that [C.W.'s] eyes were not removed on December 30 or 31. First, Dr. Slaughter is the only person who has ever claimed to have removed or even seen [C.W.'s] eyes being removed. While he admits he does not clearly remember the exact instant he removed the eyes, he believes he removed them at autopsy. He testified he consulted with two forensic pathologists prior to the autopsy to be sure he did everything correctly. He knew the eyes would be important so he removed them and placed them in a fixative to preserve them for the ophthalmologist. The reasonable inference is that the eyes were removed at the autopsy on December 29, prior to embalming. This testimony carries weight considering no other witness has claimed to know when [C.W.'s] eyes were removed. Second, the State points out that [C.W.'s] body was stored at Dakan the entire day of December 30 and only licensed staff would have had access to his body. The State also points out that no one from the coroner's office or Dakan has a memory or record of anyone going to Dakan to remove [C.W.'s] eyes. While Jim Miller's original report indicated that Doug Tucker may have done this, Mr. Tucker has subsequently testified he has never removed eyes from a body at Dakan.

Stevens has certainly raised doubts about whether [C.W.'s] eyes and tissue samples were removed at autopsy. The embalming report and Mr. Kerr's testimony are evidence that [C.W.'s] eyes were not removed until after embalming. Under Stevens' version of events, [C.W.'s] eyes had to have been removed on December 30 or 31. However, according to all accounts [C.W.'s] body remained at Dakan for all of December 30, and there is no indication anyone from the coroner's office came to remove the eyes or that they would have been able to access the back room without permission from someone at Dakan. The problem with the theory of removal on December 31 is that [C.W.] was only at St. Luke's for approximately 15-20 minutes for the long bone x-ray and mortician Kerr remained outside the x-ray room the entire time. In this time, Dr. Slaughter, or someone else, would have had to remove the eyes and take the long bone x-

rays. While Mr. Reinke did say eyes can be removed in 10-15 minutes, the 15-20 minutes [C.W.] spent at St. Luke's is a small time frame in which to perform these tasks and it is unlikely the eyes would be removed in an x-ray room.

There are several other problems with Stevens' version of events. For instance, in one version of Stevens' timeline the State removed [C.W.'s] eyes on December 31. The problem with this is Mr. Kerr observed [C.W.'s] face wounds on December 31 prior to the second long-bone x-ray. This would mean the coroner took biopsies of [C.W.'s] face on December 30 but for some reason waited until December 31 to remove [C.W.'s] eyes. This seems illogical. The Court also has trouble with Mr. Kerr's testimony that [C.W.'s] face wounds would only take about 12 hours to dry. Mr. Kerr testified he first observed [C.W.'s] wounds around noon on December 31, at which point they were moist. If the wounds were no more than 12 hours old, it would mean the coroner took these biopsies sometime between midnight and noon on December 31. Again, it seems illogical the coroner would wait until the middle of the night to take these samples. It also seems unlikely that no one from Dakan would have a memory of this. Finally, Stevens suggests all of the State's witnesses have a reason to lie to cover up their sloppy work. The problem with this is it was actually Detective Miller who first suggested that [C.W.'s] eyes were removed postembalming. If this is a case where the State made a mistake and tried to cover it up, why would Jim Miller have prepared a report that indicates [C.W.'s] eyes were removed post-embalming? If this were a cover up, it seems Miller would have simply written a report that indicated the eyes were removed at autopsy. Despite these problems, Stevens still has the embalming report which strongly suggests that [C.W.'s] eyes were present at the time of embalming.

(*Id.* at 2367-69 (internal citations omitted).)

After considering all of this evidence, the post-conviction court found that the eyes were removed at the autopsy, before the body was released and embalmed. With respect to Doug Reinke's mortuary report, which noted that C.W.'s eyes were brown—and, thus,

indicated the eyes were in place when the body was embalmed—the Court found that "the most logical explanation for the brown eyes notation in Mr. Reinke's embalming report is simple carelessness" and that "several sections of Mr. Reinke's report support [that] finding":

> First, in the section where Mr. Reinke is to list "scars" and "wounds" he only states "bruises on forehead around eyes." This is a very incomplete description of the scars and wounds present on [C.W.'s] body on December 29. By the time Mr. Reinke received [C.W.'s] body it had bruises on the face and back. [C.W.'s] skull and abdomen had also been cut open at autopsy and sewn back together. Additionally, if Dr. Slaughter's autopsy report is correct, and [C.W.'s] face was biopsied, there would have been open wounds in addition to the bruises on [C.W.'s] face. These additional wounds were not noted in the embalming report. Second, in the section entitled "evidence of external wounds" Mr. Reinke only noted "bruises." Again, this description leaves out all the additional wounds that [C.W.] would have had from autopsy. Third, Mr. Reinke left the section entitled "evidence of surgery" blank even though Dr. Slaughter had just finished sewing up [C.W.'s] scalp and abdomen. Finally, Mr. Reinke incorrectly notes that [C.W.] is 10 months old when [C.W.] was actually 11 months old.

(*Id*. at 2369-70.) Based on the report's failure to note the above injuries, the court stated, "A complete review of Mr. Reinke's embalming report suggests to this Court that Mr. Reinke filled out the embalming report hastily and inadvertently wrote down that [C.W.'s] eyes were brown." (*Id*. at 2370.)

iii.    <u>The factual finding that C.W.'s eyes were removed at the autopsy was unreasonable in light of the evidence presented to the state court, and thus this Court need not apply the presumption of correctness</u>

Petitioner challenges the substance of the post-conviction court's finding. Thus, Petitioner must establish that a court "'could not reasonably conclude that the finding is supported by the record.'" *Hibbler*, 693 F.3d at 1146 (quoting *Taylor*, 366 F.3d at 1000). After a careful review of the entire state court record, the Court concludes this is a rare case that meets that requirement. The post-conviction court's finding that C.W.'s eyes were removed before the release of the body and before embalming was unreasonable in light of the evidence presented to that court.

Nearly all of the evidence as to when Dr. Slaughter removed the eyes was equivocal. First, although the memories of the individuals involved tend to show that the eyes were removed after the body was released and embalmed, those memories are far from conclusive. No one remembers the eyes being removed at the autopsy. In 2003, Detectives Jim and Joe Miller both recalled the eyes being removed a day or two after the autopsy at the funeral home, and neither detective ever explained why he would have had that memory if the eyes were taken at the autopsy. Also, Detective Jim Miller testified that Kerr told him, as part of his 2003 investigation, that Kerr may have waited to prepare the body for viewing "because he was waiting for the coroner's office to come out" to the funeral home, which provided an opportunity for the eyes to be retrieved at the funeral home after the body was released from State custody. (State's Lodging C-12 at 706.) However, at the time of Jim Miller's investigation, nearly seven years had passed.

After that investigation, another eight years would pass before the post-conviction hearing. Mr. Kerr testified at that hearing that the wounds on C.W.'s face, from the taking of tissue samples, were still moist on December 31, 1996, and that this fact was inconsistent with the theory that they were inflicted at the autopsy on December 29 as Dr. Slaughter's autopsy report stated. This testimony suggests that at least some work to the body was done after the date of the autopsy, but it does not definitively establish the date the facial tissue samples or the eyes were taken.

Dr. Slaughter's autopsy report also reveals nothing definitive about the removal of the eyes. The report does not reflect that the eyes were removed at the autopsy. Dr. Slaughter testified that there was not a specific place in the autopsy report template to record the removal, because generally autopsies did not include eye removal. Though the post-conviction court determined that this must have been why Dr. Slaughter did not note the removal of the eyes in his report, his testimony actually cuts both ways. Given that removing eyes at an autopsy was uncommon, a competent pathologist would have noted such removal on the autopsy report, even if there were not a ready-made space on the form calling for that information. That is, because removing the eyes was such an unusual thing for Dr. Slaughter to do, one could conclude that the eyes were not removed at the autopsy because, had they been removed, Dr. Slaughter sensibly and appropriately would have made that part of his autopsy record. This is particularly so given Dr. Slaughter's emphasis upon his having consulted with two other doctors about whether to remove the eyes and what to do with them after removal.

As to the message left by the prosecutor with the coroner, indicating that she "need[ed] to know chain of custody" of the eyes, that message is ambiguous as to whether the prosecutor knew of a problem in the chain of custody of those eyes. The message was most likely left before the first or second trial, as there would be no reason to ask about the chain of custody of the eyes after Petitioner's conviction but before defense investigator Elam first contacted the prosecutor about the question of when the eyes were removed. (Reply, Dkt. 23, at 17; *see also* State's Lodging C-11 at 2365 (discussing the message that was left "sometime before the second trial").) Regardless, as the state post-conviction court described, the message does not prove that the prosecutor actually knew (or suspected) there was a *break* in the chain of custody or, more specifically, that the eyes were removed after the body was released and embalmed. It definitively proves only that the prosecutor believed she "need[ed] to know about" that chain of custody. (State's Lodging C-11 at 2365.)

Perhaps a reasonable inference from the message is that the prosecutor was aware of some sort of potential problem in the chain of custody of C.W.'s eyes. However, it is also reasonable to infer that the prosecutor was simply concerned with establishing that chain of custody as is prudent for every piece of evidence in a criminal trial. The message does not prove that the prosecutor knew with certainty the timing of the removal of the eyes or that the prosecutor acted in bad faith in avoiding her *Brady* responsibilities.[11]

---

[11] The Court does not disturb the post-conviction court's finding that the prosecutor lacked actual knowledge of the allegedly post-release and post-embalming removal of the eyes. A review of that finding is unnecessary, as a prosecutor's obligations, under *Brady*, to discover favorable evidence apply even if the prosecutor acts in good faith.

**MEMORANDUM DECISION AND ORDER - 63**

What is left then, are various pieces of evidence presented in the state court proceedings that have some relevance as to when C.W.'s eyes were removed, but most of which are individually and collectively ambiguous. The only unambiguous evidence is Reinke's mortuary report. As such, the mortuary report is particularly critical, and is the *only* contemporaneous and unambiguous documentary evidence regarding C.W.'s eyes.[12] The mortuary report is extremely strong evidence that the eyes were removed post-embalming, because Reinke (a professional mortician) noted that C.W.'s eyes were "brown" and therefore were present in the body when it was embalmed.

If the Court were reviewing all of this evidence in the first instance, the Court would find—based primarily on the mortuary report (as well as the 2003 recollections of Detectives Jim and Joe Miller)—that the eyes were removed after C.W.'s body was released to the funeral home and embalmed. However, that is not the question under AEDPA. Rather, the question is whether this evidence of post-release and post-embalming removal is so convincing that it renders the state court's contrary finding unreasonable. The answer to that question is "yes." The evidence is so compelling and convincing as to render the state court's finding unreasonable. Specifically, the significance of the embalming report cannot be overstated. In contrast to the state post-

---

[12] Jim Miller's contemporaneous investigation notes indicate that Sonnenberg informed Joe Miller on December 30, 1996 that the eyes had been removed. This evidence was ambiguous, as the notes prove only that Sonnenberg relayed this information to Joe Miller on December 30, not that the eyes were removed on December 30.

conviction court, this Court concludes that the report's notation of the presence of the eyes at embalming cannot reasonably be interpreted as resulting from neglect or mistake.

It is true that Reinke failed to note in the report all of the post-autopsy wounds present on C.W.'s body and was off by one month when reporting C.W.'s age. However, it was unreasonable for the state court to conclude that this failure supported a finding that Reinke made a mistake when he noted that C.W.'s eyes were present in the body at the time of embalming. Failing to report a wound or a bruise, or making a one-month mistake in age, is one thing. A mortician reporting the color of a pair of eyes when there are *no eyes in the body for the mortician to examine* is another thing entirely. The State attempts to minimize the significance of the report by stating that "the color of the eyes was not even important to the embalming process." (Dkt. 28 at 11.) But that fact does not matter at all. The color of the eyes is not what is important here—it is the *presence* of the eyes at the time of embalming.

Reinke had C.W.'s body before him on the embalming table for approximately two hours during the embalming process. He saw and touched C.W.'s body in performing the embalming process. Reinke had the somber responsibility to prepare the body of an eleven-month old child for burial. He had no reason to either misstate the information, or to shirk his duty in reporting the color of the child's eyes. It defies common sense to conclude that Reinke would not have observed that the eyes were missing, or that even if he had observed that the eyes were missing to then report that the "missing" eyes were brown in color. Instead, the *only* reasonable inference from Reinke's notation that C.W.'s

eyes were brown, and from Reinke's related unequivocal testimony, is that the eyes were present in the body at the time of embalming. The Court agrees with Petitioner that "it is contrary to all human experience to conclude that a competent adult would not be able to tell a pair of brown eyes from two empty eye sockets, especially if that adult is also a trained mortician, like Mr. Reinke." (Dkt. 23 at 16.)

Further, anything that might have been used in place of eyes in C.W.'s eye sockets, such as a cotton ball or an eye cap as Reinke testified, would have been placed there *by the embalmer*—by Reinke himself. (*See* State's Lodging C-12 at 587 (testimony by Reinke that eye caps are placed into the eyes "just prior to embalming"); *id*. at 660-62 (testimony by Sonnenberg that he had never seen an eye cap placed into an eye or eye socket and that there would have been no reason for the pathologist or himself to insert any sort of cap onto C.W.'s eyes).) Reinke would certainly have known the eye sockets were empty, and thus would not have recorded the eyes as brown, if he had placed anything into empty eye sockets.[13]

Thus, it was unreasonable for the state post-conviction court to find that Reinke's notation that the eyes were brown was a result of carelessness. Such a finding would mean that Reinke failed to notice that the body had no eyes, or knew that the body had no eyes, and yet mistakenly or falsely wrote that the absent eyes were brown. And where would Reinke have gotten the information about C.W.'s eye color if the eyes had already

---

[13]    No one has ever contended that C.W.'s eyes were not brown.

been removed, even if there had been any reason whatsoever to search for such information?

There is neither ambiguity nor carelessness on this record in the fact of a mortician's notation of the color of C.W.'s eyes, and such evidence can only reasonably be explained as a contemporaneous record of first-hand observation in the embalming of C.W.'s body, made by the mortician who was performing the procedure. The embalming report is sufficient—convincingly sufficient—to render unreasonable the post-conviction court's finding that removal of the eyes occurred before the release and embalming of the body.

The embalming report is the *only* unequivocal evidence regarding whether the eyes were removed before or after release and embalming. It is also the only contemporaneous evidence regarding C.W.'s eyes at all—other than the handwritten notes Detective Jim Miller took during the investigation, which noted that on December 30, 1996, the coroner who advised Detective Joe Miller that C.W.'s eyes "have been taken." (State's Lodging A-4 at 325.) Further, the mortuary report is corroborated by the two detectives' statements made in 2003, eight years before Jim Miller testified as to his changed opinion about when the eyes were removed, that they remembered the eyes being collected at the funeral home a day or two after the autopsy.

Hence, it was unreasonable for the state post-conviction court to discount the embalming report. As evidence of the timing of the removal of the eyes, the embalming report and Reinke's testimony, especially when considered with the detectives' 2003

recollections, are simply too compelling and convincing, and the state court's contrary finding was unreasonable under 28 U.S.C. § 2254(d)(2). Therefore, the Court is not bound by the finding of pre-release and pre-embalming removal when considering Petitioner's *Brady* claim.

**B.      The Prosecution Failed to Disclose Material Impeachment Evidence to the Defense**

As explained above, the elements of a *Brady* claim are: (1) the evidence must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the prosecution must have withheld the evidence, either intentionally or inadvertently; and (3) the evidence must be material to guilt or punishment. *Strickler*, 527 U.S. at 281-82. Petitioner has established all three elements.

The evidence regarding post-release and post-embalming removal of C.W.'s eyes was favorable to Petitioner because it was impeaching. Had the evidence been disclosed, Petitioner could have used it to call into question Dr. Crawford's findings regarding the eyes—particularly the macular folds—based on the break in the chain of custody of the eyes and the possibility that the macular folding was a result of embalming. This evidence offered an alternative reason for the fact that Dr. Crawford saw macular folds but Dr. Kent did not. *See Bagley*, 473 U.S. at 677. Thus, the first prong of *Brady* is satisfied.

The second prong of *Brady*—that the government failed to disclose the evidence—is also satisfied. The doctor who performed the autopsy, the coroner, and at least two police officers were aware of the timing of the removal of the eyes. Inescapably

then, the information was in the possession or control of members of the prosecution's

investigative team, notwithstanding that the prosecutor herself may have been unaware of

it. *See Kyles*, 514 U.S. at 437 ("[T]he individual prosecutor has a duty to learn of any

favorable evidence known to the others acting on the government's behalf in the case,

including the police.").

Third, and finally, the Court concludes that, considered collectively, the

undisclosed impeachment evidence was material. *See id.* at 433-34. As recognized in the

state court proceedings and decisions, the prosecution's case against Petitioner rested

centrally and critically upon a battle of the experts as to whether C.W. had been shaken.

Dr. Crawford's testimony regarding the presence of macular or perimacular folds was the

strongest evidence that C.W. was shaken. Dr. Crawford testified in absolute terms that (1)

he had never seen such macular folds in any case other than shaken-baby cases, (2) he

knew of only two other cases where such folds existed without violent shaking, and (3)

there was "no other way to explain" C.W.'s injuries. (State's Lodging A-9 at 789; *see

also* State's Lodging A-6 at 690.) Petitioner's trial experts, who were not

ophthalmologists, were not able to effectively counter this testimony.

The criminal case against Petitioner placed strongly disparate arguments and

myriad pieces of disputed evidence before the two juries. In the first trial, the jury was

unable to reach a verdict. In the second trial, with qualified scientific experts testifying

for both sides, Dr. Crawford's testimony about the macular folds in the eyes was the

strongest evidence of shaking that the jury heard. The testimony of Drs. Thibault and

Plunkett, who either disagreed with Dr. Crawford's testimony that macular folds almost always indicate shaking or who stated that no one really understands the significance of macular folding, must have been attenuated in the jurors' minds when considered alongside the confident testimony of Dr. Crawford, who specialized in eye injuries. In that courtroom, an alternative reason for the presence of the macular folds in the form of some credible reason other than Petitioner having violently shaken C.W., might well have raised reasonable doubt. Accordingly, the Court concludes it is reasonably probable that the evidence of post-release and post-embalming removal of the victim's eyes may have made the difference between the jury finding reasonable doubt in the prosecution's case, or finding beyond a reasonable doubt that Petitioner was guilty of the crime. Therefore, the evidence of post-release and post-embalming removal was material. *See Bagley*, 473 U.S. at 676.

To be entitled to relief, Petitioner need not show that the evidence of post-release and post-embalming removal of the eyes, if disclosed, would have convinced the jury of Petitioner's version of the facts. Rather, he need only show a reasonable probability of a different result. He has done so.

The "root principle" of the Great Writ "is that in a civilized society, government must always be accountable to the judiciary for a man's imprisonment." *Fay v. Noia*, 372 U.S. 391, 402, (1963), *overruled in part on other grounds by Wainwright v. Sykes*, 433 U.S. 72 (1977). Although the writ of habeas corpus is not readily or regularly granted, it remains an essential, time-tested tool that "enabl[es] an inquiry into the legality of an

individual's confinement," thereby "safeguard[ing] the integrity of the criminal justice process." Limin Zheng, *Actual Innocence as A Gateway Through the Statute-of-Limitations Bar on the Filing of Federal Habeas Corpus Petitions*, 90 Cal. L. Rev. 2101, 2109 (2002) (citing *Ex parte Watkins*, 28 U.S. 193, 7 L. Ed. 650 (1830)). After a lengthy period of careful scrutiny of this case, this Court has come to the conclusion that the decisions of the state courts described at length herein do not withstand the scrutiny of a habeas corpus lens. It is beyond argument that the prosecutor was required to discover and disclose material impeachment evidence—that C.W.'s eyes may have been removed after the body was released to the funeral home and embalmed. That did not happen. Therefore, due process was not afforded to Petitioner, and he is entitled to habeas relief on his *Brady* claim.

## CONCLUSION

For the foregoing reasons, the Court concludes that the Idaho Court of Appeals' decision on Petitioner's *Brady* claim constitutes an unreasonable application of clearly-established Supreme Court precedent and that the lower post-conviction court's factual finding of pre-release and pre-embalming removal of the victim's eyes was unreasonable and, therefore, not entitled to a presumption of correctness. The Court also concludes, on de novo review, that the State prosecution team did not disclose favorable material evidence to the defense in violation of the settled law of *Brady v. Maryland*.

Therefore, the Court finds in favor of Petitioner on Claim 1 of the Petition.

**ORDER**

**IT IS ORDERED** that Claim 1 of the Petition for Writ of Habeas Corpus (Dkt. 1) is GRANTED, and the Court issues a conditional writ of habeas corpus. The State must release Petitioner or begin new trial proceedings against him within 120 days.



DATED:  **February 7, 2018**

_____
Honorable Ronald E. Bush
United States Magistrate Judge