**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

NOV 14 2019

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| EDWARD STEVENS, | No. 18-35172 |
| Petitioner-Appellee, | D.C. No. 3:14-cv-00403-REB |
| v. | |
| TEREMA CARLIN, | MEMORANDUM* |
| Respondent-Appellant. | |

Appeal from the United States District Court
for the District of Idaho
Ronald E. Bush, Magistrate Judge, Presiding.

Argued and Submitted October 23, 2019
Seattle, Washington

Before: IKUTA and BENNETT, Circuit Judges, and RAKOFF,** District Judge.

The state of Idaho appeals the magistrate judge's grant of habeas relief to Edward Stevens, convicted of murdering C.W., an eleven-month-old baby. In 1999, Stevens was found guilty of first-degree murder in Idaho state court and

---

\* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

\*\* The Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation.

sentenced to life imprisonment without the possibility of parole.[1] In 2006, Stevens filed a motion for a new trial based, in part, on newly discovered evidence: that C.W.'s eyes were removed not at his autopsy, but post-embalming at the funeral home.[2] The judge denied the motion, and the Idaho Supreme Court affirmed in 2008. Stevens then filed a state post-conviction petition in 2009 asserting a *Brady* claim and a claim of ineffective assistance of counsel. After an evidentiary hearing, the post-conviction state court denied the petition, finding Stevens had not proven that the eyes were removed at the funeral home instead of at the autopsy. The Idaho Court of Appeals affirmed the decision, finding no *Brady* violation even if the eyes had been removed at the funeral home.[3] Stevens filed a federal habeas petition in 2014. The magistrate judge (hearing the matter by consent) held that Stevens established a valid *Brady* claim, finding among other things that C.W.'s eyes were removed at the funeral home and not at the autopsy, that the state courts had unreasonably applied *Brady*, that this evidence was exculpatory, and that it

---

[1] Stevens's first trial in 1998 ended with a hung jury.
[2] The record does not reflect that this fact was in dispute at trial. In his new trial motion, Stevens contended the eyes were removed later, after C.W.'s body was embalmed. Stevens argued this evidence was exculpatory and material. Evidence Stevens cited to support his theory that the eyes were removed post-autopsy included the mortuary report that states that C.W.'s eyes were "brown." (On the record it is unclear whether C.W.'s eyes were brown or hazel).
[3] The court of appeals held that there was no *Brady* violation even if the eyes were removed at the funeral home, because the state did not possess or control the mortuary report, and even if it did, the information in the report was not material exculpatory evidence.

2

was also material because it undercut the evidence against Stevens, which "rested centrally and critically upon a battle of the experts" to prove that Stevens shook C.W. The magistrate judge granted a conditional writ, ordering the state to release Stevens or retry him within 120 days.[4] The magistrate judge then granted a partial stay of the conditional writ pending appeal, but ordered Stevens released on bail. The state appeals from the magistrate judge's grant of the conditional writ.

On appeal the state argues the magistrate judge failed to give proper deference to factual findings and erred in finding that there was a *Brady* violation. We have jurisdiction under 28 U.S.C. § 2253(a), and we reverse and remand only for consideration of the ineffective assistance claims the magistrate judge did not reach.

In December 1996, eleven-month-old C.W. died from a fatal skull fracture while in the care of Edward Stevens. Stevens had been living with C.W. and C.W.'s mother, Michelle Daniels, since July. Michelle had dressed C.W. in a green and brown checkered shirt, blue jeans, socks, and "little blue Nikes" before leaving C.W. in the care of Stevens around 1:30 pm. Less than two hours later, Stevens called 911, and firefighters arrived to find C.W. laying shirtless on the kitchen counter, not wearing shoes or socks. After admitting C.W., the hospital

---

[4] The magistrate judge did not rule on Stevens's claims of ineffective assistance of counsel.

3

immediately notified law enforcement because "a child [] had a serious skull fracture, cardiac arrest, retinal hemorrhage, subdural hematoma, multiple bruises over his face and body of different ages." The next day, doctors diagnosed C.W. as brain dead and removed him from life support.

At trial, Stevens testified that he dozed off and woke to find C.W. lying at the bottom of the stairs. The state argued that Stevens became frustrated with C.W., shook him violently, and slammed his head against the side of a bathtub upstairs. The state introduced evidence that Stevens was continually angry with C.W. and engaged in a long and brutal pattern of physical[5] and verbal abuse of C.W. Autopsy photos introduced at trial depicted a baby covered nearly head to toe in bruises. Stevens also told a detective that he "explodes" when he is angry. Stevens often screamed at C.W., including telling C.W. to "shut up, you little maggot." Stevens also told C.W.: "You're going to have to quit being such a spoiled little brat and learn who is the man in this house … if you want to live here." Stevens's demeanor and comments before, during, and just after C.W.'s

---

[5] The state did not introduce direct evidence that Stevens physically abused C.W. other than one instance where Stevens yelled at C.W. and threw a hard rubber ball at the baby's head. But the state did introduce very strong circumstantial evidence, including evidence that showed that C.W.'s increased bruises coincided with Stevens moving in, as well as testimony by multiple family friends and family members that during that time period C.W. had bruising all over his head and arms, that they never saw C.W. fall down or bruise while in their care, that in one instance Stevens set C.W. down "hard" while using "very foul language" with C.W, and that C.W. sustained additional injuries while on Stevens's watch.

hospitalization were bizarre and inconsistent—for example, when Michelle's friend asked Stevens what had happened, he replied: "Only me and God will know." The state also presented medical evidence that C.W.'s injuries could not have resulted from a fall down the stairs, and that C.W. had shaken baby syndrome.[6] The jury found Stevens guilty of murder in the first degree.

We assume *arguendo* that Stevens's *Brady* claim is entitled to *de novo* review.[7] See *Kirkpatrick v. Chappell*, 926 F.3d 1157, 1167 (9th Cir. 2019) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) ("Courts can . . . deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review.")).

On *de novo* review, assuming the eyes were removed during or after embalming, Steven's *Brady* claim fails because he has not shown that the timing of the removal of the eyes was material evidence that had a "reasonable probability" of affecting the outcome of the trial.[8] See *United States v. Bagley*, 473 U.S. 667,

---

[6] This is a brief summary of the evidence.
[7] We therefore do not reach the question of whether the Idaho Court of Appeals decision denying Stevens post-conviction relief was "contrary to" or an "unreasonable application" of *Brady v. Maryland*, 373 U.S. 83 (1963), under § 2254(d)(1).
[8] We assume without deciding that Stevens has met the first two elements of a *Brady* claim: (1) the evidence is favorable to Stevens and (2) the prosecution withheld the evidence, intentionally or inadvertently. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

5

682 (1985). The "touchstone of materiality" in *Bagley* is "reasonable probability"—did Stevens receive a fair trial that "result[ed] in a verdict worthy of confidence"? *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). We find that he did.

At trial, the state presented overwhelming evidence that Stevens was guilty of murdering C.W., including evidence that: (1) Stevens severely physically and verbally abused and neglected C.W. from the time C.W. was five months old; (2) a tumble down the padded and carpeted stairs could not have caused C.W.'s injuries;[9] (3) Stevens waited a long time before calling 911 based on the low pH level and body temperature at the time of C.W.'s arrival at the hospital; (4) the fatal injury occurred upstairs in the bathroom, as a result of Stevens slamming C.W.'s head against the bathtub; (5) Stevens made materially inconsistent statements about what happened to C.W.; and (6) Stevens's behavior, statements, and demeanor before and after C.W. died were detached, abnormal, and odd. And

---

[9] These injuries included C.W.'s severe skull fracture, brain trauma and retinal hemorrhaging. At oral argument, Stevens argued that he introduced evidence during the post-conviction evidentiary hearing that the size of the skull fracture was smaller than suggested at trial. *See* Oral Argument at 21:40, Stevens v. Carlin, No. 18-35172 (9th Cir. argued Oct. 23, 2019), https://www.youtube.com/watch?v=VIaKbKZkVmc&t=1300s. Even assuming Stevens is correct, Dr. Brady at trial based his ultimate conclusion not just on the size of the skull fracture, but also its unusual location, and also because of the lack of *any* scrapes on C.W.'s nose, knees, and elbows consistent with a fall down carpeted stairs. Further, Dr. Bettis observed retinal hemorrhaging while C.W. was still alive and before his eyes were removed.

the state presented other evidence (besides macular folding) that Stevens violently shook C.W. before murdering him.

Dr. Crawford, the state eye expert, testified that his conclusion of "violent shaking" was based on a "constellation of findings." He testified that only one of these findings, the retinal folds, is affected by the timing of the removal of the eyes. The severity, location, and type of retinal hemorrhages are not impacted.

Defense experts also testified at trial that: (1) there was no evidence of macular or retinal folding while C.W. was alive; (2) macular folds are not correlated to shaken baby syndrome; and (3) "no one knows" the significance of macular folds or how they occur. Thus, the jury had evidence that macular folding may not have been relevant, present, or indicative of shaking.

Based on a full review of the record, we conclude that introduction of the timing of the removal of the eyes would not have "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. The jury already had defense expert witness testimony discounting the presence and relevance of macular folding. And macular folding was not the lynchpin of the state's evidence. The state relied on many pieces of powerful evidence to make its case, including evidence of Stevens's abuse, behavior, statements, and demeanor, as well as evidence of retinal hemorrhaging.

We therefore find that Stevens received "a verdict worthy of confidence" and has not shown that the new evidence is material. *Id.* at 434.

**REVERSED and REMANDED.**