UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| EDWARD STEVENS,<br><br>                    Petitioner,<br><br>        v.<br><br>TEREMA CARLIN,<br><br>                    Respondent. | Case No. 3:14-cv-00403-REB<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Habeas corpus petitioner Edward Stevens ("Petitioner" or "Stevens") asserts that he is incarcerated in violation of the United States Constitution. *See* 28 U.S.C. § 2254. At Petitioner's trial, evidence established that Petitioner's girlfriend's eleventh-month old son, C.W., died from a head injury when he was left in Petitioner's care. Petitioner maintained that the child fell down a flight of stairs and hit his head. The state theorized, and the jury determined, that Petitioner had violently shaken the child and slammed the child's head against the bathtub.

Petitioner challenges his judgment of conviction for first-degree murder, which was entered following a guilty verdict at a second trial.[1] The Ninth Circuit Court of Appeals previously reversed this Court's grant of habeas corpus relief on Claim 1 of the Petition and remanded for consideration of Petitioner's remaining claims. *See* Dkt. 75.

---

[1] Petitioner's first trial ended in a mistrial when the jury could not reach a verdict.

MEMORANDUM DECISION AND ORDER - 1

Claim 1 alleged a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), arising from the failure of the prosecution to disclose evidence that the victim's eyes were removed for testing not at the autopsy, but after the body was released to the funeral home and embalmed.

In reversing this Court's decision, the court of appeals held, on de novo review, that the information regarding the timing of the eye removal was not material under *Brady*.[2] Dkt. 75 at 5–6. The Ninth Circuit did not disturb this Court's holding that the Idaho Court of Appeals' decision on Claim 1 was both an unreasonable application of clearly established Supreme Court precedent and based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). The Ninth Circuit also left in place this Court's conclusions (1) that the eye-removal information was favorable to Petitioner and (2) that the evidence that was was within the state's possession or control was suppressed by the prosecution. Dkt. 75 at 5 n.8. Thus, these holdings remain law of the case for purposes of this opinion. *See United States v. Cuddy*, 147 F.3d 1111, 1114 (9th Cir. 1998) ("The law of the case doctrine provides that a court is generally precluded from reconsidering an issue that has already been decided by the same court … in the identical case.") (internal quotation marks omitted).

The Court must now consider whether Petitioner is entitled to habeas relief on Claims 2 and 3 of the Petition. These claims were adjudicated on the merits by the Idaho Court of Appeals during post-conviction proceedings.

---

[2] The Ninth Circuit assumed, without deciding, that Petitioner was entitled to de novo review of his *Brady* claim. *Dkt. 75* at 5.

MEMORANDUM DECISION AND ORDER - 2

Claim 2 asserts ineffective assistance of trial counsel[3] and includes three sub-claims. Claim 2(a) asserts that counsel should have discovered and presented the evidence regarding the timing of the removal of C.W.'s eyes. Claim 2(b) alleges that counsel should have discovered and presented evidence that the medication Propulsid—which C.W. was taking for a reflux problem—could cause cardiac arrest, and that Propulsid could negatively interact with Zithromax, an antibiotic medication that C.W. was also taking. Claim 2(c) asserts that counsel should have consulted with a pediatric radiologist regarding a scan of C.W.'s skull—a scan showing that the victim's skull fracture, at the time of the injury, may have been much smaller than was measured at the autopsy and that the fracture expanded *before* C.W.'s death due to intracranial pressure.

Claim 3 asserts ineffective assistance of appellate counsel, based on counsel's failure to challenge, on direct appeal, the appointment of the former trial judge—then a sitting justice of the Idaho Supreme Court—to hear and rule upon Petitioner's motion for a new trial.

All parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. *See* Dkt. 9. Having carefully reviewed the record in this matter, including the state court record, the Court concludes that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d). Accordingly, the Court enters the following Order denying habeas corpus relief and entering judgment in favor of Respondent.

---

[3] Petitioner's trial counsel at the second trial had not represented Petitioner at the first trial.

**DISCUSSION**

Many of the facts of this case and the standards of law governing the Court's review of the Petition are set forth in the Court's earlier opinion on Claim 1 and will not be repeated here. *See* Dkt. 30. The Court incorporates fully those facts and standards of law and will include, in this opinion, only those facts and standards relevant to Claims 2 and 3 that were not discussed in the Court's prior decision.

1. **Standards Governing Habeas Claims Adjudicated on the Merits in State Court**

A federal court may grant habeas corpus relief when it determines that the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). If the state court has adjudicated a claim on the merits, habeas relief is further limited by § 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, federal habeas relief may be granted only where the state court's adjudication of the petitioner's claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "Deciding whether a state court's decision involved an unreasonable application of federal law or was based on an unreasonable determination of fact requires the federal habeas court to train its attention on the particular reasons—

both legal and factual—why state courts rejected a state prisoner's federal claims and to give appropriate deference to that decision." *Wilson v. Sellers*, 138 S. Ct. 1188, 1191–92 (2018) (internal quotation marks and citations omitted).

Petitioner contends that the state court's decision on Claims 2 and 3 constituted an unreasonable application of Supreme Court precedent under § 2254(d)(1). *See* Dkt. 23 at 37–57, 59–69, 73–79. For the reasons that follow, the Court disagrees.

## 2. Clearly Established Law Governing Claims of Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution provides that a criminal defendant has a right to the effective assistance of counsel in his defense. The Supreme Court explained the standard against which to measure claims of ineffective assistance claims in *Strickland v. Washington*, 466 U.S. 668 (1984). An assertion of ineffective assistance of counsel ("IAC") requires a showing that (1) "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) those errors prejudiced the defendant by "depriv[ing] the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. A petitioner must establish both deficient performance and prejudice to prove an IAC claim. *Id.* at 697. On habeas review, a court may consider either prong of the *Strickland* test first, or it may address both prongs, even if one prong is not satisfied and would compel denial of the IAC claim. *Id.*

Whether an attorney's performance was deficient is judged against an objective standard of reasonableness. *Id.* at 687-88. A reviewing court's inquiry into the reasonableness of counsel's actions must not rely on hindsight:

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.* Because of the difficulties inherent in making the evaluation, *a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance*; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* at 689 (emphasis added) (internal citations and quotation marks omitted).

Counsel's strategic decisions "are virtually unchallengeable" if "made after thorough investigation of law and facts relevant to plausible options." *Id*. at 690. Moreover, an attorney who decides not to investigate a potential defense theory is not ineffective so long as the decision to forego investigation is itself objectively reasonable:

[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

MEMORANDUM DECISION AND ORDER - 6

*Id.* at 690–91. That is, "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

Ninth Circuit decisions upon such "strategy calls" are instructive in assessing whether the state court reasonably applied *Strickland* when considering a habeas petitioner's IAC claim. *See Duhaime*, 200 F.3d at 600. First, tactical decisions do not constitute IAC simply because, in retrospect, better tactics are known to have been available. *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984). Second, a mere difference of opinion as to tactics does not render counsel's assistance ineffective. *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981). Third, "counsel's investigation must determine trial strategy, not the other way around." *Weeden v. Johnson*, 854 F.3d 1063, 1070 (9th Cir. 2017).

Even if counsel's performance is shown to be deficient, the petitioner must also show that the deficient performance caused prejudice. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. As *Strickland* instructs:

> In making this determination, a court hearing an
> ineffectiveness claim must consider the totality of the
> evidence before the judge or jury. Some of the factual

> findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id.* at 695–96. To constitute *Strickland* prejudice, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

These principles from *Strickland* also apply to claims of ineffective assistance by counsel on a direct appeal. Effective legal assistance does not require appellate counsel to appeal every question of law or every nonfrivolous issue that might be requested by a criminal defendant. *Jones v. Barnes*, 463 U.S. 745, 751–54 (1983). "Nothing in the Constitution" requires "judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client." *Id.* at 754. "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Id.* at 751–52.

Therefore, although it is "possible to bring a *Strickland* claim based on [appellate] counsel's failure to raise a particular claim, ... it is difficult to demonstrate that counsel was incompetent." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). Deficient performance of

MEMORANDUM DECISION AND ORDER - 8

appellate counsel can be shown only when counsel failed to raise a nonfrivolous issue that "was clearly stronger than [the] issues that counsel did present." *Id.*

For IAC claims against counsel on direct appeals, the *Strickland* prejudice standard also must be met. Specifically, a petitioner must show that his appellate attorney failed to raise an issue obvious from the trial record that probably would have resulted in reversal of the conviction. *Turner v. Duncan*, 158 F.3d 449, 459 (9th Cir. 1998), *as amended on denial of reh'g* (Nov. 24, 1998); *Miller v. Keeney*, 882 F.2d 1428, 1434 n.9 (9th Cir. 1989). If a petitioner does not show that an attorney's act or omission would probably have resulted in reversal, then he cannot satisfy either prong of *Strickland*— appellate counsel was not ineffective for failing to raise such an issue, and petitioner suffered no prejudice as a result of it not having been raised. *Miller*, 882 F.2d. at 1435.

The foregoing standard, giving deference to counsel's decision-making, is the de novo standard of review. Then, another layer of deference—to the state court decision— is afforded under AEDPA. In giving guidance to district courts reviewing *Strickland* claims on habeas corpus review, the United States Supreme Court explained:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "*an unreasonable application of federal law is different from an incorrect application of federal law.*" *Williams*, *supra*, at 410, 120 S. Ct. 1495. A state court must be granted a deference

and latitude that are not in operation when the case involves
review under the *Strickland* standard itself.

*Richter*, 562 U.S. at 101 (emphasis added). That is, when evaluating an IAC claim under

§ 2254(d), this Court's review of that claim must be "doubly deferential." *Cullen v.*

*Pinholster*, 563 U.S. 170, 190 (2011) (internal quotation marks omitted).

**3.      Petitioner Is Not Entitled to Habeas Relief on Claim 2: Ineffective Assistance
of Trial Counsel**

> ### A.      *Claim 2(a): Failure to Discover Evidence that C.W.'s Eyes Were Removed after Release and Embalming of the Body*

In Claim 2(a), Petitioner asserts that his trial attorneys rendered ineffective

assistance in failing to discover evidence that C.W.'s eyes were removed for testing *after*

the body had been released to the funeral home and embalmed.

> #### i.      Factual Basis of Claim 2(a)

The injuries to C.W.'s eyes tended to show that C.W. had been shaken. In its prior

ruling, this Court discussed the significance of the state's expert's findings about the eyes

and will not repeat it here. What the defense did not know at the time, and what came to

light only after trial, was that the eyes might have been removed for examination not at

the autopsy—which is what would have been expected—but at the funeral home, after

C.W.'s body had been released and embalmed. In post-conviction proceedings, Petitioner

presented evidence that the injuries in C.W's eyes could have been caused by the

embalming process and not by violent shaking, which was the State's theory at trial.

Dr. Slaughter was the pathologist who performed C.W.'s autopsy. At some point,

Dr. Slaughter removed C.W.'s eyes, at the direction of the coroner, and placed them in a

fixative so they could later be sent to a specialist for examination. One would naturally expect that, if the eyes were to be removed for examination, the pathologist would do so during the autopsy. At the preliminary hearing, Dr. Slaughter briefly discussed his removal of the eyes:

> Q.     And Doctor, after you completed the autopsy, did you—were there documented retinal hemorrhages in [C.W.]?
>
> A.     Yes. I retrieved the eyes and sent them to the University of California at San Francisco where they examined by an ophthalmologic pathologist, who is a pathologist who specializes in looking at the eyes, and he documented retinal hemorrhages.

*State's Lodging A-41* at 96.

As this Court has previously explained, from this testimony, it "could be inferred that, despite the break in the prosecutor's question, Dr. Slaughter was speaking about his actions after the autopsy, given that the prosecutor prefaced the question with that time frame, and Dr. Slaughter used the word 'retrieved.'" *See* Dkt. 30 at 42. However, it could also be inferred that Dr. Slaughter was not commenting at all about the timing of the eye removal, as Dr. Slaughter had been testifying about the autopsy, and one could infer that he was still talking about the autopsy when he discussed retrieving the eyes for later examination by an ophthalmologic pathologist. *See id.* at n. 10 ("In all of his court appearances, Dr. Slaughter generally testified about his examination of the victim's body, which occurred during the autopsy …. An inference could, of course, be drawn that Dr. Slaughter was still talking about the autopsy when he testified as to the removal of the eyes ….").

At the first trial, Dr. Slaughter testified about the autopsy and his findings. Toward the end of cross-examination, Dr. Slaughter was asked about C.W.'s eyes:

> Q.     Doctor, did you remove [C.W.'s] eyes?
>
> A.     I did.
>
> Q.     For what purpose?
>
> A.     The coroner had me remove them and keep them until they tell me what to do with them later.
>
> Q.     Did you notice or did you inspect those eyes for retinal hernia?
>
> A.     Retinal hemorrhages, no, I'm not an ophthalmology pathologist who does only eyes. So I just put them in formalin which is fixative and keeps them preserved and put them in that until I was told what to do with them.
>
> Q.     And you are aware, however, are you not, Doctor, that blunt force trauma such as the one that [C.W.] suffered at the back of his head could cause retinal hemorrhage?
>
> A.     Yes.

*State's Lodging A-7* at 1125–26.

On redirect, Dr. Slaughter again discussed C.W.'s eyes:

> Q.     Dr. Slaughter, counsel was talking to you about the eyes that you removed, [C.W.'s] eyes. And did you send those eyes to be examined by a forensic ophthalmologist?
>
> A.     I did.
>
> …
>
> Q.     Doctor, you received that report back from Dr. Crawford [the forensic ophthalmologist]?
>
> A.     I did.

MEMORANDUM DECISION AND ORDER - 12

> Q.     Dr. Slaughter, are you an expert in retinal hemorrhages
> and how those occur?
>
> A.     No.

*Id*. at 1126–27. Once again, one could infer from Dr. Slaughter's testimony that he was still referring to his actions at the autopsy when he discussed removing C.W.'s eyes, though he did not testify specifically that he removed the eyes during the autopsy.

In preparation for the second trial, Petitioner's trial counsel reviewed Dr. Slaughter's previous testimony from the preliminary hearing and the first trial. *State's Lodging C-12* at 330–31, 336, 795–96. Neither counsel nor any defense expert questioned or investigated the chain of custody of the child's eyes in general, or the timing of the removal of the eyes in particular, in preparation for trial. Petitioner's counsel found nothing strange or suspicious from Dr. Slaughter's previous testimony about his removal of the eyes, so found no reason to investigate whether chain of custody in general, or the timing of the removal in particular, was at issue. *Id*. Neither did any defense expert question the state of the eyes or call into question the timing of the eye removal.

At trial, the state's expert testified that "the combination of macular folding, perineural hemorrhages and the severity, frequency and locations of retinal hemorrhages in [C.W.'s] eyes were indicative of shaken baby syndrome." *State v. Stevens* (*Stevens I*), 191 P.3d 217, 223 (Idaho 2008), *abrogated on other grounds by State v. Garcia*, 462 P.3d 1125 (Idaho 2020). Defense experts disputed that these factors demonstrated shaken baby syndrome.

MEMORANDUM DECISION AND ORDER - 13

However, "[a]fter trial, an investigator for Stevens's public defender contacted a prosecutor in the case and raised the issue of whether [C.W.'s] eyes were removed before or after his body was embalmed." *Id*. The prosecutor then had a detective investigate the issue. This same detective, and his brother who also was a detective, each stated in 2003 that they recalled the eyes were removed at the funeral home, rather than at the autopsy.[4] The post-trial investigation also turned up a mortuary report, which "showed that the person who performed the embalming noted [C.W.'s] eyes were brown. This evidence suggest[ed] that [C.W.'s] eyes were removed after his body was embalmed because to make this observation [C.W.'s] eyes had to be in his body." *Id*. at 224.

From this, Petitioner moved for a new trial, "arguing that the embalming fluid and post-embalming removal caused some of the injuries to [C.W.'s] eyes. In support he presented the affidavits of three new experts who examined evidence presented at trial and concluded that the macular folding and retinal hemorrhaging were caused after [C.W.'s] death." *Id*. Petitioner's new trial motion was denied, and the Idaho Supreme Court affirmed.

This Court previously held that the prosecution suppressed all of the post-embalming eye-removal evidence that was in its possession or control, including the detectives' and the autopsy doctor's knowledge at the time of removal. This conclusion remains the law of the case. *See Cuddy*, 147 F.3d at 1114. The prosecution did not possess or control the mortuary report, however. "Rather, the funeral home (which was

---

[4] By the time of the evidentiary hearing on this issue, however, memories had faded, and no one could specifically remember when the eyes were removed.

clearly not a State agent) had sole possession of the report until well after the trial in

2003." *Stevens v. State*, 156 Idaho 396, 408, 327 P.3d 372, 384 (Idaho Ct. App. 2013)

(*Stevens II*). Therefore, the prosecution could not have suppressed it. Accordingly, the

mortuary report is the *only* evidence regarding the timing of the eye removal that

Petitioner's trial counsel could have discovered before trial and, therefore, is the only

evidence relevant to counsel's performance as to Claim 2(a).

  ii.  <u>Decision of the Idaho Court of Appeals</u>

  The Idaho Court of Appeals made a factual finding—that Dr. Slaughter had

previously testified "that he recalled removing the eyes during the autopsy" and that

"[n]either the State, nor its witness, Dr. Slaughter, gave any indication but that the eyes

were removed during the autopsy and held until they could be sent to an expert

ophthalmologist." *Stevens II*, 327 P.3d at 390 (quoting *Stevens I*, 191 P.3d at 232 (Trout,

J., dissenting)). The Idaho Court of Appeals went on to conclude that, although the

mortuary report "*could* have been discovered by counsel prior to trial," counsel's failure

to do so did not constitute deficient performance because "counsel's investigation was

otherwise reasonable":

> [T]here is no assertion that defense counsel here failed to
> uncover and utilize the most obvious and highly relevant
> information (including police reports, medical records, and
> the autopsy report) or to pursue the obvious defenses given
> the evidence uncovered. Nor was there evidence that a mere
> lack of objectively reasonable diligence was the cause of the
> failure to uncover the mortuary report. In addition, as we
> discussed above [with respect to the *Brady* claim], the
> potentially exculpatory significance of the eyes being
> removed post-embalming was not readily apparent and only
> came to light once the defense found an expert to opine such

MEMORANDUM DECISION AND ORDER - 15

a procedure could damage the eyes in a manner replicating that seen in shaken baby cases. Even now, after Stevens was given the opportunity to develop the evidence at a post-conviction evidentiary hearing, the evidence is not entirely clear as to when the eyes were removed—and expert opinions continue to be conflicting as to whether the eyes were damaged by embalming. Thus, even assuming reasonably diligent counsel would have discovered the mortuary report, discovery of the report does not warrant an assumption that reasonable counsel would have recognized its importance. *See Strickland,* 466 U.S. at 690, 104 S. Ct. at 2065, 80 L.Ed.2d at 695 (noting that counsel's conduct must be evaluated from "counsel's *perspective at the time*") (emphasis added). *Holding that defense counsel were required, in order to render constitutionally adequate assistance, to uncover an ambiguous reference in an obscure report, recognize that the piece of evidence may be significant, and locate experts to testify as much, is simply untenable given the strong presumption existing that counsel's performance is adequate.*

*Stevens II*, 327 P.3d at 390–91 (emphasis added). The state appellate court did not discuss the prejudice prong of *Strickland*. *See id*.

> iii.     The State Court's Decision that Counsel Did Not Perform Deficiently as to Claim 2(a) Was Not Unreasonable under AEDPA

The Idaho Court of Appeals reasonably concluded that Petitioner's counsel did not render deficient performance in failing to discover the mortuary report, in that before the close of the second trial, a reasonably competent attorney would not have been put on notice that the eyes might have been removed after release and embalming of the body.

A close reading of Dr. Slaughter's testimony at the preliminary hearing and the first trial reveals that he never testified precisely that he removed the eyes at the autopsy. However, that was certainly a reasonable interpretation of his previous testimony. *See* Dkt. 30 at 42 n.10 ("In all of his court appearances, Dr. Slaughter generally testified

MEMORANDUM DECISION AND ORDER - 16

about his examination of the victim's body, which occurred during the autopsy, but he never pinned down a particular time frame with respect to the removal of the victim's eyes. An inference could, of course, be drawn that Dr. Slaughter was still talking about the autopsy when he testified as to the removal of the eyes …."). Thus, the Idaho Court of Appeals reasonably found, as a factual matter, that Dr. Slaughter had indeed testified that he removed the eyes during the autopsy.[5] *See* 28 U.S.C. § 2254(d)(2).

Having reviewed Dr. Slaughter's testimony—that he removed the eyes at autopsy—Petitioner's counsel had no reason to question the timing of the eye removal. Dr. Slaughter's testimony at the preliminary hearing and the first trial did not suggest that there was anything unusual or suspicious about the chain of custody of the eyes in general, or about when the eyes were removed in particular. Therefore, the Idaho Court of Appeals reasonably held that trial counsel did not perform deficiently by not spontaneously wondering, and then investigating, whether the eyes might have been removed later, after the body had been released and embalmed.

Petitioner also has presented no evidence that professional standards of competency would have required counsel to request documents regarding post-autopsy embalming, or any other document for that matter, from a funeral home. No expert opined that a reasonably competent attorney would have done so, particularly where all other available evidence suggested that the eyes were, as would be expected, removed at

---

[5] In finding that Dr. Slaughter testified that he recalled removing the eyes during the autopsy, the Idaho Court of Appeals quoted Justice Trout's dissenting opinion in Petitioner's direct appeal. Importantly, the majority opinion on direct appeal did not dispute Justice Trout's statement that Dr. Slaughter testified that he removed the eyes at autopsy. *See Stevens I*, 191 P.3d at 224.

MEMORANDUM DECISION AND ORDER - 17

autopsy. Because no one had any inkling at that time that the eye removal was suspect, counsel reasonably "operated under the presumption that normal, proper protocols would have been utilized." *State's Lodging C-12* at 447. Moreover, the doctors to whom counsel provided the autopsy report for review raised no concerns to counsel about the eye removal. Simply put, not until long after trial was there any indication, to a reasonably competent attorney, that the eyes may have been removed after release and embalming of the body.

Petitioner argues, as he did to the state appellate court, that the Idaho Supreme Court's decision in his direct appeal prohibited the Idaho Court of Appeals from later rejecting Claim 2(a). *See* Dkt. 23 at 38–40. In the direct appeal, the state supreme court held—under Idaho state law—that the eye removal evidence was not "new" for purposes of Petitioner's motion for a new trial[6]:

> Substantial and competent evidence in the record supports a conclusion that the primary evidence that [C.W.'s] eyes were removed after embalming—the Mortuary Embalming Report—was available before trial. It also supports a conclusion that the affidavits Stevens presented did not contain new evidence, but only new interpretations of existing evidence. The record also supports that Stevens was aware the State would use expert witness testimony about injuries to [C.W.'s] eyes to support its theory that Stevens killed [C.W.] during a battery….
>
> In order to be newly discovered evidence, the evidence itself, not just importance or materiality of that evidence, must be unknown and unavailable prior to trial. *State v. Weise,* 75 Idaho 404, 410, 273 P.2d 97, 100–01 (1954). The

---

[6] A criminal defendant is entitled to a new trial under Idaho law "[w]hen new evidence is discovered material to the defendant, and which he could not with reasonable diligence have discovered and produced at the trial." Idaho Code § 19-2406(7); *see also* Idaho Crim. R. 34(a) ("On the defendant's motion, the court may vacate any judgment and grant a new trial on any ground permitted by statute.").

> fact that the defense did not inquire about the report until well after the trial does not make this report newly discovered. Likewise, that Stevens failed to present his own experts' opinions at trial does not make the evidence on which they rely newly discovered. At most, Stevens has demonstrated that he did not recognize the importance or materiality of the Mortuary Embalming Report. As such, he has not presented any newly discovered evidence within the meaning of I.C. § 19-2406(7) and is not entitled to a new trial based on newly discovered evidence.

*Stevens I*, 191 P.3d at 224. The Idaho Supreme Court expressly declined to address the diligence factor under Idaho Code § 19-2406(7) and, in so doing, declined to adopt the state trial court's diligence findings. *Id.*

According to Petitioner, because the state supreme court found that the mortuary report was available before trial—and thus could have been discovered before trial—then counsel necessarily was deficient in failing to discover it. However, no clearly established Supreme Court precedent establishes such a rule. The Sixth Amendment guarantees adequate counsel, not the best counsel possible, and a petitioner does not establish deficient performance by showing that counsel *could* have discovered evidence before trial. *See, e.g., Hinton v. Alabama*, 571 U.S. 263, 272 (2014) ("[D]efendants are entitled to be represented by an attorney who meets at least a minimal standard of competence."). Even if Petitioner's trial counsel "could well have made a more thorough investigation than [they] did," this Court must "address not what is prudent or appropriate, but only what is constitutionally compelled." *Burger v. Kemp*, 483 U.S. 776, 794 (1987); *see also Hendricks v. Calderon*, 70 F.3d 1032, 1039 (9th Cir. 1995) (describing the *Strickland* standard as "the floor of minimal competence").

MEMORANDUM DECISION AND ORDER - 19

Moreover, the Idaho Supreme Court on direct appeal did not address whether counsel should have discovered the mortuary report with the exercise of due diligence, and the majority opinion did not dispute Justice Trout's factual description of Dr. Slaughter's previous testimony—that Dr. Slaughter testified that he removed the eyes at autopsy. This left the Idaho Court of Appeals free, in Petitioner's post-conviction appeal, to make the reasonable factual finding that Petitioner's counsel had no reason to suspect that the chain of custody of the eyes or the timing of their removal should be investigated.

Finally, the state court correctly highlighted that the standards for a new trial under Idaho Code § 19-2406(7) are entirely separate from Sixth Amendment standards as set forth in *Strickland*. Thus, the Idaho Court of Appeals reasonably concluded that it was not required to grant relief on Claim 2(a) simply because the Idaho Supreme Court had previously affirmed the denial of Petitioner's motion for a new trial by holding that the mortuary report was not "new" evidence.

For the foregoing reasons, the Idaho Court of Appeals reasonably rejected Petitioner's claim of deficient performance with respect to the removal of C.W.'s eyes.

iv.     <u>On De Novo Review, Even If Counsel's Failure to Discover the Mortuary Report Was Deficient, Petitioner Cannot Show Prejudice</u>

Even if counsel had performed deficiently in failing to discover the mortuary report, Claim 2(a) would fail the prejudice prong of *Strickland* on de novo review.[7]

---

[7] Respondent argues that, if the Court reaches the prejudice prong of *Strickland*, it must presume that the state appellate court addressed the prejudice prong on the merits and, therefore, review the claim under AEDPA's deferential standard. *See Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the

MEMORANDUM DECISION AND ORDER - 20

"*Brady* materiality and *Strickland* prejudice are the same." *Gentry v. Sinclair*, 705 F.3d 884, 906 (9th Cir. 2013). Therefore, "if the information … does not constitute a *Brady* violation for lack of materiality, it will likewise not support an ineffective assistance claim." *Id.*

The Ninth Circuit Court of Appeals has held that the eye removal evidence was not material under *Brady*—meaning that, because of other strong evidence of Petitioner's guilt presented at trial, the eye removal evidence did not put the whole case in such a different light as to undermine confidence in the verdict. Necessarily, therefore, Petitioner cannot establish a reasonable probability that, had Petitioner's counsel discovered and presented this evidence at trial, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694; *Gentry*, 705 F.3d at 906.

For the foregoing reasons, Claim 2(a) must be denied.

## B.     Claim 2(b): Failure to Present Drug Evidence Regarding Propulsid and Zithromax

At the time of his death, C.W. was taking Propulsid, a medication prescribed for acid reflux, and Zithromax, an antibiotic. Claim 2(b) asserts that trial counsel should have

---

contrary."); *Johnson v. Williams*, 568 U.S. 289, 298 (2013) (applying the *Richter* merits-presumption to state court decision addressing some, but not all, claims).

       It is unclear whether the merits-presumption applies where, as here, the state court addressed all of the claims raised by the petitioner, but did so explicitly only with respect to one prong of a two-prong claim. Even if the presumption does apply in such a situation, however, that presumption is rebuttable. Because the Idaho Court of Appeals expressly analyzed the deficient performance prong of *Strickland* with respect to Claim 2(a), and did not expressly analyze the prejudice prong, it is more likely that the court simply found it unnecessary to consider that prong, rather than deciding it on the merits but declining to write about it. In any event, the Court holds that Claim 2(a) would fail the prejudice prong even on de novo review. Thus, it is unnecessary also to consider that issue with AEDPA deference.

discovered and presented at trial evidence that Propulsid, particularly when taken with Zithromax, could possibly cause cardiac arrest in infants.

        i.          <u>Factual Basis of Claim 2(b)</u>

Before trial, at least some evidence in the field of medicine was available that medications taken by C.W., including an acid reflux drug called Propulsid, could perhaps cause heart attacks. But, one of Petitioner's own experts acknowledged in state court that "[m]edical knowledge about the danger of Propulsid was limited in 1999." *State's Lodging C-1* at 175. Nonetheless, "there were warnings that Propulsid should not be prescribed to infants; that it could cause serious, life-threatening ventricular arrhythmias; and that it was contraindicated with antibiotics, such as Zithromax, which the child was also taking." *Stevens II*, 327 P.3d at 391; *see also State's Lodging C-1* at 175 (Dr. Durham stating that the "medical community was very suspicious of this drug").

Medical research suggested that Propulsid could potentially cause cardiac arrest, particularly in children and when taken in combination with an antibiotic like Zithromax. Though the research to that point had failed to establish "causality" between the drugs and cardiac arrest, several patients taking Propulsid had died of cardiac problems. *State's Lodging C-11* at 2372. This potential risk was specifically noted in children. As the state district court described:

> Propulsid, also known as Cisapride, is an acid reflux medication initially released in 1993. In 1996, the New England Journal of Medicine released an article authored by two doctors entitled "Cisapride and Fatal Arrhythmia." The article reports that between 1993 and 1996, fifty-seven patients taking Propulsid reported serious adverse side effects. Four of these patients died. Fifty-six percent of these

MEMORANDUM DECISION AND ORDER - 22

patients were also taking medications contraindicated for Propulsid. The article also notes a temporal association between the taking of Propulsid and the onset of arrhythmia.

In 1998, the maker of Propulsid issued a "Dear Doctor Letter." A Dear Doctor Letter is "basically information that is sent out to people whose responsibility it is to prescribe or use Propulsid." The purpose of these letters is to "warn the doctor about serious side effects that could affect the patient for whom the prescription has been written." The letter warns that torsades de pointes and cardiac arrest have been reported in patients taking Propulsid. The letter also warns that Propulsid is contraindicated with drugs such as Zithrormax. In a section entitled "Pediatric Use," the letter states:

> *Safety and effectiveness in pediatric patients have not been established. Although causality has not been established, serious adverse events, including death, have been reported in infants and children treated with cisapride. Several pediatric deaths were due to cardio vascular events.* Pediatric deaths have been associated with seizures and there has been at least one case of 'sudden unexplained death' in a 3-month-old infant…A one-month-old male infant received 2 mg/kg of cisapride four times per day for 5 days. The patients developed third degree heart block and subsequently died of right ventricular perforation caused by pacemaker wire insertion.

…. In an FDA talk paper, released several days after the Dear Doctor Letter, the FDA reports that between 1993 and 1998 there were 38 deaths in the U.S. of people who were taking Propulsid. *The FDA paper also warns that patients taking Propulsid should not take drugs such as Zithromax.* Despite these warnings Propulsid was not pulled from the market until July 2000.

*Id*. (emphasis added) (internal quotation marks, citations, and footnote omitted) (first

omission in original)). Information regarding the potential risks of Propulsid in infants

was also "contained in the 1998 Physician' Desk Reference, a copy of which

[Petitioner's] counsel believed was available in his office." *Stevens II*, 327 P.3d at 391.

Trial counsel were not aware of this particular information. However, at least one

of Petitioner's attorneys—second-chair counsel John DeFranco—was aware that there

might be a potential problem associated with the drugs C.W. had been taking. DeFranco

was first advised to investigate the drug issue by out-of-state attorney Annabelle Hall,

who told him about possible dangers from Propulsid. *State's Lodging C-11* at 2374. Hall

also informed DeFranco that "drug interaction is an important area to study in the context

of preparing a shaken baby defense" and that "it shouldn't be ignored." *State's Lodging

C-12* at 804–05. DeFranco's notes of his conversation with Hall indicate Hall told

counsel that prescribing Propulsid for an infant "borders on malpractice" and that the

potential drug interactions might cause liver damage and heart arrhythmia, which could

explain C.W.'s "lapse of consciousness on [the] stairs." *State's Lodging C-15*, Ex. 109.

As a result of his discussion with Hall, DeFranco spoke "to some of the medical

experts about those drugs." *State's' Lodging C-12* at 805. In particular, DeFranco sent

letters to forensic pathologists Dr. Dimaio and Dr. Plunkett (the latter of whom testified

at trial), "asking them about possible drug interaction between Propulsid and Zithromax."

*State's Lodging C-11* at 2374; *see also State's Lodging* C-15, Ex. 111, 112. Neither

doctor informed counsel of any specific concerns. DeFranco testified that he "probably

asked any medical expert that would talk to [him] whether or not the medications could

have somehow played a role." *State's Lodging C-12* at 806. DeFranco learned from these

inquiries that, generally, "it was troubling that a child would be taking these medications,

MEMORANDUM DECISION AND ORDER - 24

especially together," but he did not "ever remember making a link that would connect the dots for [Stevens's] defense." *Id*.

The defense investigator also looked into the drug issue. He reported to Petitioner and DeFranco that the drug issue was "a very important issue." DeFranco testified:

> And I remember it being a—and I don't want to say a point of contention. It was hard finding a place for it to fit in in preparing for trial. And I know that, again, this was something that was very important to Ed Stevens, and, in turn, it was very important with [the investigator]. But in a lot of ways, as a defense practitioner, I had a hard time linking it up for the trial.

*Id*. at 808–09. To Defranco's recollection, he, the defense investigator, and Petitioner discussed the drug issue and decided not to pursue it:

> We probably made decisions to commit to a certain strategy as opposed to having kind of a shotgun approach to presenting a case to a jury. And in that regard, as it relates to the medications, I'm sure we brought it up, but I'm fairly confident that we failed to link it up in terms of our overall defense.

*Id*. at 809.

DeFranco testified at the post-conviction evidentiary hearing that he could have used the evidence about Propulsid in one two ways. First, he could have argued that C.W. died of a heart attack rather than a fall down the stairs. But counsel stated that he would not have made that argument because "the bumper-sticker issue for the jury trial was what caused the skull fracture, and my argument or our argument is it was a stair fall." *Id*. at 813. Next, he could have argued that the medication caused C.W. to be lethargic, which may have provided an alternate reason why C.W. might have fallen down the

MEMORANDUM DECISION AND ORDER - 25

stairs. *Id.* at 813–14. However, second-chair counsel also would not have made this argument, because there was already a "reasonable explanation" for C.W.'s fall as described by Petitioner—C.W. was a young child learning to walk and was not coordinated. *Id.* at 815.

On the other hand, Petitioner's lead attorney Edward Odyssey, who ultimately made the strategic decisions, testified that, had he known of the specific cardiac dangers of the drugs, he would have changed his trial strategy:

> Cause of death of [C.W.]—he was only alive 11 months. The last nine months of his life he was being administered Propulsid throughout in conjunction with Zithromax mostly, or some other penicillin derivative throughout. Dosages were increasing as for both Propulsid and Zithromax, is my recollection. And even though the child was not really improving, he was still being administered those medications.

> If, in fact, [C.W.] suffered those consequences of Propulsid, which was never supposed to be given to an infant; that is to say, under one year of age anyway, but if they affected his balance, dizziness and perhaps caused a heart attack, [C.W.] could well have died at the top of those stairs … before any impact occurred, and that could well have been presented at trial.

*State's Lodging C-12* at 371.

ii.    Decision of the Idaho Court of Appeals

The Idaho Court of Appeals found that Petitioner's lead counsel discussed the Propulsid issue personally with Dr. Plunkett and was not notified of a potential problem with the drug. *Stevens II*, 327 P.3d at 393. The court also found that, after second-chair counsel's initial inquiries to Dr. Dimaio and Dr. Plunkett, counsel made a conscious,

tactical decision not to pursue the drug issue further as a line of investigation. *Id*. at 392.

Finally, the court found that, before making that tactical decision, both counsel undertook

significant efforts to establish a link between the drugs the victim was taking and the

victim's death:

> As the district court pointed out, counsel undertook efforts (that were not insignificant) to establish such a link. The record establishes that once Hall, the out-of-state attorney that defense counsel consulted with for help in this case, alerted counsel to the possible dangers of Propulsid and drug interactions, counsel brought this issue to the attention of, at the very least, both Dr. Vincent Dimaio and Dr. John Plunkett. Dr. Plunkett, a forensic pathologist, eventually testified as an expert witness at trial. In fact, Second Chair, who conducted the bulk of the investigation into the issue, testified at the evidentiary hearing that he "probably asked any medical expert that would talk to me whether or not the medications could have somehow played a role [in the child's death]." As a result of these discussions, Second Chair continued, he learned "generically ... it was troubling that a child would be taking these medications, especially together. But I don't ever remember making a link that would connect the dots for [Stevens's] defense." *Lead Counsel testified that he personally spoke to Dr. Plunkett, one of the defense's main expert witnesses who testified at trial, regarding the Propulsid issue and they "went through pretty exhaustively ... all the medical things regarding [the child] that were provided to him." As the district court found, because counsel were unable to link the drug issue to the child's death, even after consulting these experts, counsel made the decision to abandon further investigation.*

*Stevens II*, 327 P.3d at 392–93 (emphasis added) (footnotes omitted) (alterations in

original).

The Idaho Court of Appeals recognized that the question about trial strategy

concerning the drug issue was a close one. However, the court ultimately decided "that

defense counsel's performance in failing to discover the warnings available in 1998, that

Propulsid could cause heart attacks in children, was not the result of an objectively

unreasonable abbreviation of investigation into the issue":

> [J]ust because counsel *could* have found something helpful,
> doesn't mean he is deficient for not having found that
> information. In this case, *we are not willing to say it is
> constitutionally unreasonable for counsel to ask numerous
> doctors (experts in issues concerning the death of the child)
> about the possible side effects of a drug and, not having
> received any positive indication that a further investigation
> into the drug is necessary, to fail to then consult a reference
> book.* This is the type of "rigid requirement[] for acceptable
> assistance" the *Strickland* Court warned against. *Strickland,*
> 466 U.S. at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695. Here,
> *defense counsel made a concerted effort to investigate the
> issue, and just because it did not pan out, or may not have
> been conducted in the precise manner which, in hindsight,
> seems appropriate since there were, in fact, warnings
> regarding Propulsid at the time, we cannot say it constituted
> such deficient performance* that "counsel's conduct so
> undermined the proper functioning of the adversarial process
> that the trial cannot be relied on as having produced a just
> result." *Id.* at 686, 104 S. Ct. at 2063, 80 L.Ed.2d at 692–93.

*Id.* at 393 (second and third emphases added). Hence, having concluded that the decision

not to further pursue the drug issue was a reasonable strategic decision, the state appellate

court denied Claim 2(b).

        iii.       <u>The State Court's Decision that Counsel Did Not Perform
Deficiently as to Claim 2(b) Was Not Unreasonable under AEDPA</u>

Petitioner does not challenge the factual findings of the Idaho Court of Appeals as

to Claim 2(b). Nonetheless, this Court has reviewed those findings and concluded they

are not unreasonable under § 2254(d)(2). Given the specific testimony and exhibits

showing that trial counsel contacted at least two doctors about the issue and discussed the

MEMORANDUM DECISION AND ORDER - 28

issue with Dr. Plunkett, the state court reasonably found that counsel undertook significant efforts to investigate the drug issue and, ultimately, made a strategic decision to not investigate that issue further.

Notably, the double deference that applies when reviewing ineffective assistance claims in habeas proceedings leaves no room for this Court to second-guess, with the benefit of hindsight, the tactical decision of Petitioner's counsel to refrain from further pursuit of the drug issue. *See Pinholster*, 131 S. Ct. at 1403; *Strickland*, 466 U.S. at 689. After speaking with Hall, trial counsel asked at least two forensic pathologists about the drug issue. Neither alerted counsel to any concerns. The mere fact that trial counsel failed to consult a different or potentially more qualified expert, such as a pediatrician, does not constitute objectively unreasonable representation in violation of the Sixth Amendment. On that point, the Ninth Circuit's decision in *Babbitt v. Calderon* is instructive. 151 F.3d 1170 (9th Cir. 1998), *as amended* (Aug. 27, 1998). There, counsel consulted with experts he believed were well-qualified. Because those experts did not recommend that counsel contact other experts, it did not constitute deficient performance for trial counsel not "to seek [additional experts] out independently." *Id*. at 1174.

Similarly, here, the experts whom Petitioner's trial counsel consulted regarding the drug issue did not suggest additional consultation with other experts. Further, trial counsel already had a credible explanation for an argument that C.W. had fallen down the stairs, *i.e.*, C.W.'s lack of coordination while learning to walk, an explanation supported by multiple witnesses. As to an alternative argument that the drugs caused C.W.'s death, neither of the doctors whom counsel contacted about the drug issue suggested that C.W.

MEMORANDUM DECISION AND ORDER - 29

died from anything other than a head injury. Counsel was not then required, in order to provide constitutionally acceptable representation, to independently seek out additional evidence on the drug issue.

Perhaps there could have been more to counsel's investigation into the drug issue. Counsel could have consulted the Physician's Desk Reference and, thereby, learned of the potential cardiac risks of the drugs the victim was taking. But the Sixth Amendment does not entitle a defendant to a perfect investigation by counsel—only a minimally competent one. Both attorneys' strategy was to ensure the jury knew that a fall down the stairs could have caused C.W.'s death, as Petitioner claimed. DeFranco, second-chair counsel, performed a reasonable scope of investigation into the medication issues, and ultimately decided that there was insufficient medical evidence to rely on this factor at trial. No precedent exists requiring second-chair to consult with first-chair on every potential defense theory. Second-chair counsel was a duly licensed attorney qualified to decide investigative strategy. In any event, lead counsel himself discussed the drug issue with Dr. Plunkett and was not alerted to any potential problem.

Trial counsel retained several scientists who provided evidence to support the conclusion that the skull fracture could indeed have been caused by a fall down the stairs. Given that both counsel had already decided on this strategy, a fair-minded jurist could conclude that it was not deficient performance for counsel to forgo further investigation into the risks of the drugs, either as a cause for the purported fall down the stairs or as an alternate cause of death. For example, presenting this additional factor may have led the jury to identify the theory as a red herring, discrediting the entire stair-fall defense. That

one of Petitioner's attorneys would have made a different tactical choice if he had learned about the cardiac risks of the drugs also does not establish that either attorney's representation (or both, for that matter) was constitutionally deficient.

The Idaho Court of Appeals' rejection of Claim 2(b) reasonably applied *Strickland* in determining that trial counsel did not perform deficiently with respect to the drug issue. Therefore, Claim 2(b) must be denied.

### C.    Claim 2(c): Failure to Consult a Pediatric Radiologist Regarding C.W.'s Skull Fracture

In Claim 2(c), Petitioner contends that trial counsel rendered ineffective assistance in failing to consult with a pediatric radiologist about C.W.'s skull fracture.

i.    Factual Basis of Claim 2(c)

When the paramedics responded to Petitioner's 911 call the day of the incident, C.W. was not bleeding, and there was no immediate indication that he had suffered a skull fracture. "It was not until a CT scan was taken of [C.W.'s] skull that doctors realized he had a fracture." *State's Lodging C-11* at 2375.

Paramedics first took C.W. to St. Alphonsus Hospital, where providers performed a CT scan of C.W.'s brain. The next day, x-rays were taken at St. Luke's Hospital, where C.W. died. *State's Lodging C-36* at 2.

Dr. Slaughter, who performed the autopsy, measured C.W.'s skull fracture as nine centimeters long. *State's Lodging C-11* at 2375. At trial, Dr. Slaughter testified that the fracture was eight to nine centimeters long. This measurement was based on the images

taken at St. Luke's—not those taken a day earlier at St. Alphonsus. As noted by the state

district court,

> It appears no one attempted to measure the size of [C.W.'s]
> skull fracture based on the CT scan taken at St. Alphonsus,
> even though this scan was taken within hours of [C.W.'s]
> injury. Dr. Smith [a pediatric radiologist who testified for the
> State at trial, *see State's Lodging* A-9 at 1372] never offered
> an opinion as to the length of the fracture, and appears to have
> taken Dr. Slaughter at his word that a high force impact
> caused [C.W.] to suffer a nine centimeter fracture.

*Id*. The evidence that the length of C.W.'s skull fracture was eight to nine centimeters

went uncontested at trial.

What caused C.W.'s skull fracture "was the primary issue at trial," *id*. at 2376, and

Petitioner's trial counsel were well aware the state would argue that the fracture was

caused by a high degree of force that was not possible to have been sustained in a fall

down the stairs. The prosecution and Petitioner each called various experts. The state's

experts generally testified that the fracture was too large to have been caused by falling

down the stairs, while Petitioner's experts testified that the fracture could, indeed, have

been caused by such a fall.

In post-conviction proceedings, Petitioner presented the testimony of Dr. Patrick

Barnes, who reviewed the x-rays and scans of C.W., including the St. Alphonsus CT scan

taken within hours of the injury. Dr. Barnes found that, based on the St. Alphonsus scan,

C.W.'s skull fracture was only three to four centimeters when the child was at St.

Alphonsus. *State's Lodging C-36* at 2. Dr. Barnes opined that the fracture then expanded,

due to intracranial pressure, in the time between the St. Alphonsus scan and the St.

MEMORANDUM DECISION AND ORDER - 32

Luke's x-rays. *Id.* That is, at the time of injury, the skull fracture was much smaller than was shown by the St. Luke's images. Another of Petitioner's post-conviction experts, Dr. Cyril Wecht, opined that this smaller fracture "could quite easily" have occurred as Petitioner maintained:

> The fact that the fracture depicted in the St. Alphonsus Regional Medical Center CT scans is 3 to 4 cm rather than the 8 cm length (as testified by the prosecution's expert initially) strengthens and buttresses my opinion that this fracture could quite easily have been caused by an accidental fall. There is no scientific basis for an absolute, rigid conclusion that such a skull fracture could only have been sustained through the deliberate infliction of force by a third party.
>
> …
>
> The injuries that led to the death of this 11-month old child can logically and quite reasonably be related to accidentally incurred trauma.

*State's Lodging C-40* at 3.

> ii.   Decision of the Idaho Court of Appeals

In rejecting Claim 2(c), the Idaho Court of Appeals accepted the following factual findings made by the state district court:

> The affidavit of Dr. Barnes shows [that] *whatever caused [the child's] skull fracture required less force than previously thought by either party* because the impact only caused a four-centimeter fracture rather than a nine-centimeter fracture. *However, Stevens' counsel did retain experts who testified that a fall down the stairs could produce a great deal of force.* Dr. Richard Reimann, a physicist, testified [the child's] head could have been traveling at eight to twelve miles per hour at the time of impact. He also testified [the child's] head would have been subject to forces of at least 160 g's, which is the threshold for serious injury. Dr. Lawrence

MEMORANDUM DECISION AND ORDER - 33

> Thibault testified [the child's] fracture could have easily been
> caused by a fall down stairs. Counsel also called Dr. John
> Plunkett who testified that a fall from even two stairs up can
> produce enough force to crack a child's occipital bone. Thus,
> *counsel secured three experts, a physicist, a bio-engineer and*
> *forensic pathologist, who all testified that a fall from these*
> *stairs could have caused a nine centimeter fracture in [the*
> *child's] occipital bone.* Counsel found exactly what they set
> out to find, three experts who were all ready to testify that
> Stevens' version of events was not only plausible, but very
> possible.

*Stevens II*, 327 P.3d at 394–95 (emphasis added) (alterations in original).

Relying on these facts, the Idaho Court of Appeals held that, although trial counsel

could have discovered the evidence of the smaller skull fracture, they did not perform

deficiently by failing to do so because "the steps counsel did take in investigating the

issue … were not insignificant":

> Second Chair testified he had reviewed every medical record
> in the case, and there is no indication in the record, nor
> argument from Stevens, that counsel did not provide the
> experts it consulted with the requisite medical records. As
> noted by the district court, *the information that counsel did*
> *receive regarding the length of the fracture from the three*
> *experts did not indicate that further investigation was*
> *required in order to support the defense's theory because all*
> *three indicated even an eight to nine centimeter fracture*
> *could be caused by an accidental fall. In addition, none of the*
> *experts apparently alerted counsel to the possibility that the*
> *fracture could have been smaller at its inception.*

*Id.* at 395 (emphasis added).

The state court noted that "counsel's performance will not be found to have been

deficient just because counsel failed to consult experts who may have been helpful in the

case." *Stevens II*, 327 P.3d at 396. The court relied on *Strickland* for the proposition that

MEMORANDUM DECISION AND ORDER - 34

the "constitutional guarantee of effective assistance of counsel simply does not ensure that counsel render stellar performance; rather, to be deficient performance, counsel's conduct must have so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* (internal quotation marks and alterations omitted). Concluding that Petitioner did not establish that counsel's failure to consult a pediatric radiologist was constitutionally deficient, the court of appeals rejected Claim 2(c).

> iii.     The State Court's Decision that Trial Counsel Did Not Perform Deficiently as to Claim 2(c) Was Not Unreasonable under AEDPA

The Idaho Court of Appeals reasonably concluded that trial counsel did not perform deficiently by failing to consult with a pediatric radiologist regarding C.W.'s skull fracture. Petitioner does not contest the Idaho Court of Appeals' implicit finding that his counsel provided C.W.'s medical records—which would have included the St. Alphonsus CT scan—to the three experts they did consult. *See Stevens II*, 327 P.3d at 375 ("[T]here is no indication in the record, nor argument from Stevens, that counsel did not provide the experts it consulted with the requisite medical records."). None of these experts raised any concerns regarding the size of the skull fracture at the time of injury. Most notably, not even the forensic pathologist retained by trial counsel suggested that the size of the skull fracture could be disputed. Having consulted three experts who raised no concerns about the size of the fracture, counsel acted reasonably in not specifically contacting a pediatric radiologist to examine C.W.'s medical images. *See Hendricks*, 70 F.3d at 1039 ("[F]orcing lawyers to second-guess their experts … would effectively

eliminate the legitimate role experts play in guiding and narrowing an attorney's investigation.").

Further, this Court agrees with the state district court that once all of counsel's experts opined that a fall down the stairs could have caused a nine-centimeter fracture, "[a] reasonable attorney would not continue to investigate a question for which he already had an answer. At this point, a reasonable attorney would have ceased investigation into whether a fall down stairs could have caused [C.W.'s] fracture and proceeded to more fruitful areas of investigation." *State's Lodging C-11* at 2377.

Again, the possibility that trial counsel *could* have found a different and potentially more qualified expert to examine the St. Alphonsus CT scan does not render counsel's performance deficient, given that the experts whom were consulted did not alert counsel to any potential problem with the argument in their trial strategy that a fall down the stairs could have caused a nine-centimeter fracture. *See Babbitt*, 151 F.3d at 1174. Having consulted with these experts and decided on a strategy of showing that a fall could indeed have caused such a fracture, trial counsel did not perform deficiently in deciding not to pursue additional experts to reconsider the size of the fracture.

A court addressing an IAC claim must review counsel's strategic decisions, including the decision not to investigate an issue or not to investigate further, with a "heavy measure of deference." *Strickland*, 466 U.S. at 691. This Court must go even further under § 2254(d), however, and apply yet another layer of deference to the Idaho Court of Appeals' decision that counsel did not perform deficiently. *See Pinholster*, 563 U.S. at 190. Having done so, the Court concludes that Petitioner has not established that

MEMORANDUM DECISION AND ORDER - 36

the state court's rejection of Claim 2(c) was unreasonable under AEDPA. Thus, Claim 2(c) must be denied.

**4.     Petitioner Is Not Entitled to Habeas Relief on Claim 3: Ineffective Assistance of Direct Appeal Counsel**

Claim 3 asserts that direct appeal counsel should have argued that the Idaho Supreme Court erred by appointing a sitting justice of that court—who had been the presiding trial judge—to hear Petitioner's motion for a new trial. Petitioner asserts that the failure to raise that argument on direct appeal constituted deficient performance and that, had the issue been raised, there is a reasonable probability that Petitioner would have prevailed on appeal.

### A.     *Factual Basis of Claim 3*

"[A]fter presiding over Stevens' second trial and sentencing proceedings, then District Court Judge Eismann was elected to the Idaho Supreme Court." *Stevens II*, 327 P.3d at 387. Petitioner later filed his motion for a new trial. The Idaho Supreme Court assigned Justice Eismann to hear the motion, noting that the trial court had requested judicial assistance. *Id*.

Petitioner moved the Idaho Supreme Court to reconsider the appointment. In the state district court, Petitioner also objected to the appointment and moved to disqualify Justice Eismann. In both courts, Petitioner argued that Justice Eismann was ineligible, under the Idaho State Constitution, to sit as a district court judge. *Id*. The Supreme Court, "after due consideration" and stating that it was "fully advised," denied the motion to reconsider the appointment. *Id*. Justice Eismann, sitting as the presiding district court

judge in the proceedings on Petitioner's motion for a new trial, denied Petitioner's

objection as well, stating that the Idaho Supreme Court had already "rejected such an

argument." *Id*.

After the new trial motion was denied, Petitioner's appellate counsel did not again,

on direct appeal, raise the issue of Justice Eismann's appointment. *See State's Lodging B-*

*8, B-10*.

### B.   *Decision of the Idaho Court of Appeals*

Article V, section 12 of the Idaho Constitution provides as follows:

> A judge of any district court, or any retired justice of the
> Supreme Court or any retired district judge, may hold a
> district court in any county at the request of the judge of the
> district court thereof, and upon the request of the governor, or
> of the chief justice, and when any such request is made or
> approved by the chief justice it shall be his duty to do so[.]

Idaho Const., art. V, § 12. In his motion to reconsider the appointment of Justice Eismann

to hear the new trial motion, Petitioner argued to the Idaho Supreme Court that Justice

Eismann was constitutionally ineligible because he was a sitting Idaho Supreme Court

justice—not a "judge of any district court," a "retired justice of the Supreme Court," or a

"retired district judge." The Idaho Supreme Court rejected this argument when it denied

Petitioner's motion to reconsider the appointment.

On appeal from the dismissal of Petitioner's post-conviction petition, Petitioner

argued that appellate counsel rendered ineffective assistance in failing to raise this claim

on appeal from the denial of the motion for a new trial. The Idaho Court of Appeals

disagreed:

MEMORANDUM DECISION AND ORDER - 38

> Here, we cannot say counsel's performance in failing to
> appeal this issue was objectively unreasonable such that it
> amounted to deficient performance. The Supreme Court itself
> appointed Justice Eismann to hear the new trial motion, and
> even after Stevens filed a motion in that court for
> reconsideration, which asserted the same claims of error he
> pursues in this appeal, the Supreme Court still rejected the
> motion. The fact that counsel did not then include this issue in
> the direct appeal to the Supreme Court is not unreasonable ….

*Stevens II*, 327 P.3d at 388. The appellate court concluded, "[I]t was counsel's

prerogative as an appellate practitioner to pursue the issues most likely to prevail, and we

cannot say counsel did not do so here." *Id.*

### C.    The State Court's Rejection of Claim 3 Was Not Unreasonable under AEDPA, and this Court Would Reject It Even under De Novo Review

#### i.    Petitioner's Appellate Counsel Did Not Perform Deficiently

When the Idaho Supreme Court appointed Justice Eismann to hear Petitioner's

motion for a new trial, Petitioner's counsel argued to that court that the appointment

violated the Idaho State Constitution. The Idaho Supreme Court rejected the claim on the

merits at that time.[8]

Thus, by the time of Petitioner's direct appeal, the highest state court had already

rejected the argument that Justice Eismann was ineligible to preside over Petitioner's new

trial proceedings. Therefore, Petitioner's appellate counsel did not perform deficiently by

---

[8] Petitioner argues here, as he did to the Idaho Court of Appeals, that the Idaho Supreme Court must have denied the motion to reconsider for procedural reasons, rather than substantive reasons, because it did not have jurisdiction over the motion to reconsider. Dkt. 23 at 74–75. The Court rejects this argument. The Idaho Supreme Court's language—stating that it was "fully advised" and that it denied the motion "after due consideration"—shows that the court denied Petitioner's constitutional argument on the merits. This Court is bound by the state supreme court's interpretation of state law, including an implied interpretation of its own jurisdiction. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

MEMORANDUM DECISION AND ORDER - 39

failing to raise that argument—again—on appeal from the denial of the new trial motion. Counsel reasonably concluded that the Idaho Supreme Court would not be persuaded by the very argument it had previously rejected, nor would the Idaho Court of Appeals disagree with the highest state court on that issue. Indeed, raising a claim that had already been rejected (and recently) by the state's highest appellate court could well have been considered frivolous. Thus, counsel wisely focused on "a few key issues" and "winnow[ed] out" the weaker argument regarding Justice Eismann's judicial eligibility, which had already been rejected by the Idaho Supreme Court. *See Jones*, 463 U.S. at 751–52.

In addressing Claim 3, the Idaho Court of Appeals applied the appropriate principles from *Strickland* and *Jones* and reasonably concluded that appellate counsel did not perform deficiently.

### ii. Petitioner Cannot Show *Strickland* Prejudice as to Claim 3

Even if appellate counsel should have raised Claim 3 on direct appeal, that claim would fail the prejudice prong of *Strickland* under de novo review. This Court is bound by the Idaho appellate courts' state-law conclusion that Justice Eismann was, in fact, constitutionally eligible to preside over Petitioner's motion for a new trial. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). Accordingly, Claim 3 would have been rejected even if counsel had re-raised it on appeal, and Petitioner cannot show a reasonable probability of a different result.

Therefore, Claim 3 must be denied.

## CONCLUSION

The Idaho Court of Appeals rejected Claims 2 and 3 of the Petition, concluding

that neither Petitioner's trial counsel nor direct appeal counsel performed deficiently.

That conclusion was objectively reasonable under 28 U.S.C. § 2254(d). Therefore, the

Court must deny habeas relief on Claims 2 and 3.

## ORDER

**IT IS ORDERED:**

1.      Claims 2 and 3 of the Petition for Writ of Habeas Corpus (Dkt. 1) are

        DENIED. Consistent with the Ninth Circuit's previous memorandum

        disposition, Claim 1 is also DENIED, and judgment will be entered in favor

        of Respondent.

2.      The Court does not find its resolution of Claims 2 and 3 to be reasonably

        debatable, and a certificate of appealability will not issue. *See* 28 U.S.C.

        § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases.


DATED: January 5, 2021

Ronald E. Bush
Chief U.S. Magistrate Judge